**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF VIRGINIA**

Alexandria Division

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>AHMAD SAYED HASHIMI,<br><br>a/k/a "Jimmy"<br>a/k/a "Jimmy Jimski"<br>a/k/a "Jamshaid"<br>          Defendant. | Case No. 1:16-CR-135<br><br>Honorable Liam O'Grady<br><br>Trial:   September 26, 2016 |

### UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION IN LIMINE

COMES NOW the United States of America, by and through its counsel, Dana J. Boente, United States Attorney for the Eastern District of Virginia, Whitney Dougherty Russell, Assistant United States Attorney, and Sean Michael Welsh, Special Assistant United States Attorney, and responds to the defendant's motion in limine to preclude evidence of defendant's prior assaults of victim H.D.

### I.      Introduction

On June 22, 2016, a grand jury returned a four-count Indictment charging the defendant with: (1) one count of conspiracy to distribute oxycodone; (2) conspiracy to distribute cocaine; (3) kidnapping; and (4) interstate domestic violence. The case is set for a jury trial on September 26, 2016.

### II.      Factual Background

During the trial, the government will adduce evidence showing that beginning in

1

approximately November 2009, the defendant entered into a conspiracy to distribute cocaine. In connection with this conspiracy, the defendant began buying powder cocaine in the Eastern District of Virginia and elsewhere, cutting it, and reselling it as powder cocaine to a number of individuals in the Eastern District of Virginia and elsewhere.

In approximately summer of 2011, the defendant met H.D. Shortly thereafter, they became romantically involved. From approximately August 2011 through November 2013, the defendant and H.D. lived together and were in a domestic relationship.   From approximately August 2011 through approximately February 2013, the defendant directed H.D. to distribute powder cocaine for him to his customers. The defendant told H.D. that she was less likely than he was to attract the suspicion of law enforcement. H.D. delivered cocaine for the defendant on a daily basis throughout this period, ferrying drugs provided by him to his individual customers, and returning cash provided by those customers to the defendant.

During the period in which he was distributing cocaine, the defendant became very concerned about law enforcement attention to cocaine distribution, and decided to transition to distributing oxycodone. Together with H.D., the defendant organized, created, and managed a significant conspiracy to obtain oxycodone from pharmacies using fraudulent prescriptions and to resell the oxycodone on the street. Although the defendant did participate in obtaining and reselling the oxycodone pills, for the most part the defendant protected himself by directing H.D. to obtain and distribute the pills on his behalf and return the money to him.

Throughout H.D.'s relationship with the defendant, he was consistently very controlling, paranoid, and jealous with respect to her. He would not let her handle money, demanding that she turn over all of her cash to him as the "man" in their relationship. He would not let her speak

2

with other men, except for those customers of him with whom she was communicating at his direction. He frequently assaulted her, including hitting her in the face and head with a closed fist causing bruising and bleeding, and choking her until she lost consciousness, frequently because he suspected her of withholding cash or pills from the drug distribution scheme from him, and sometimes for unknown or unrelated reasons. Several witnesses will testify to the violent nature of the defendant towards H.D., including that H.D. frequently had bruising on her face as a result of physical altercations with the defendant. Neighbors called 911 on several occasions as a result of hearing the defendant beating H.D. in their home, which resulted in police responding to the home. On at least two occasions, H.D. had to go to the emergency room as a result of injuries sustained from beatings by the defendant. Even today, H.D. still has lumps and ridges on her temples as a result of beatings from the defendant that never fully healed.

In fall of 2013, the relationship between H.D. and the defendant had deteriorated. Shortly before November 8, 2013, the defendant became suspicious that H.D. had not returned to him the full quantum of oxycodone pills obtained through a fraudulent prescription passed at the defendant's direction. This argument developed into a physical altercation in the defendant's home with the defendant repeatedly hitting H.D. in the face and choking her. H.D. was able to flee the apartment and took with her some of the defendant's cocaine prepared for resale. Upon discovering that H.D. had stolen his cocaine, the defendant began frantically looking for her, including offering a cocaine and cash bounty to anyone willing to help him find her.

On November 8, 2013, the defendant was able to convince certain other members of the conspiracy to assist him in locating H.D. One of the conspirators was able to contact H.D. and set up a meeting with her. The defendant organized a group of five men in two vehicles and

3

planned to travel to the location where the meeting was supposed to take place. When H.D. arrived at the location for the meeting with the conspirator, the defendant and the other men surrounded her vehicle with their cars to prevent her from leaving. The defendant pulled H.D. out of the back seat of the vehicle while two other men prevented other individuals from interfering. The defendant began physically beating H.D. around her face and head while screaming at her to return the cocaine and pills she had stolen from him.

Eventually, the defendant pulled H.D. into one of the vehicles he had arrived in. While another individual drove, the defendant continued assaulting the H.D. in the back seat. Eventually, that vehicle arrived at a location where the defendant's car was parked, and the defendant dragged H.D. into his own car. The defendant then drove his own car while holding H.D. in the front passenger seat.   He continued to assault her while he drove across the 14th Street bridge into Washington, D.C. At a momentary stop at a red light, H.D. was able to escape the vehicle and fled to nearby law enforcement officers. The defendant sustained substantial swelling and bruising and was covered in her own blood. She was transported to the hospital emergency room and treated for her injuries. Notably, she initially reported that her assailant was someone other than the defendant.

At trial, the government seeks to introduce evidence of the incidents of prior domestic abuse committed by the defendant against H.D. In addition to testimony regarding the facts above from several lay witnesses, including H.D. herself, the government intends to introduce evidence of two police responses to the defendant's apartment to 911 calls for domestic disputes. One of these incidents occurred on June 3, 2013.   On that day, officers with the Alexandria Police Department responded to a domestic violence call.   The responding officers arrived and

spoke with H.D. Although H.D. denied that any domestic abuse had occurred, officers observed broken plates and glass on the floor of the apartment and a red mark on H.D.'s forehead. Throughout her interaction with the responding officers, H.D. was treating her forehead with an icepack. A second incident occurred on October 7, 2013. Again, Alexandria Police officers responded to the defendant's apartment in response to a neighbor's 911 call for domestic violence. That neighbor observed the defendant throw H.D. from the apartment and then drag her back into the residence. The neighbor heard screaming and the breaking of glass from the apartment and called the police. Responding officers observed that H.D. had swelling above her right eye and a cut by her right ear. Again, despite visible evidence of assault, H.D. denied that any domestic violence had occurred. Finally, the government intends to offer evidence of medical records from two separate emergency room visits where H.D. sought medical attention after being assaulted by the defendant.

### III.   <u>Discussion</u>

This Court has recognized the axiomatic rule that relevant evidence may be admitted unless it is precluded by a specific rule of evidence.

> The fundamental distinction in evidence law is between relevant and irrelevant evidence. As a baseline, evidence which tends to make a fact material to the case more or less probable is relevant and therefore admissible. Fed. R. Evid. 401–02. Rule 404(b)(1) creates an exception to the baseline by excluding evidence of a crime, wrong, or other act offered "to prove a person's character in order to show that on a particular occasion the person acted in accordance [therewith]." But in the next section the rule clarifies that prior bad acts evidence *may* be admissible for other purposes, and gives several examples of reasons such evidence might be admitted. Fed. R. Evid. 404(b)(2). The Fourth Circuit interprets the interaction of the parts of Rule 404(b) as creating a "rule of inclusion," and considers the rule's list of reasons to admit bad acts evidence non-exhaustive. *United States v. Queen,* 132 F.3d 991, 994–95 (4th Cir. 1997). To determine whether evidence is admissible under Rule 404(b), the Fourth Circuit asks whether the evidence is "(1) relevant to an issue other than character; (2) necessary; and (3) reliable." *United States v.*

> *Wells,* 163 F.3d 889, 895 (4th Cir. 1998). "Evidence is necessary where, considered in light of other evidence available ..., it is an essential part of the crime charged." *Queen,* 132 F.3d at 998. Evidence is reliable if it could reasonably be believed by a rational and properly instructed juror. *United States v. Hornsby,* 666 F.3d 296, 308 (4th Cir. 2012). Of course, Rule 403 also applies, so any evidence whose probative value is substantially outweighed by its prejudicial, confusing, or dilatory nature must also be excluded.

*United States v. Torrez*, No. 1:11-CR-115, 2013 WL 204727, at *1 (E.D. Va. Jan. 17, 2013, Judge Liam O'Grady).

The Fourth Circuit has recognized that Rule 404(b)'s prohibition is narrow. Most fundamentally, Rule 404(b) has no application to evidence of uncharged conduct that is intrinsic to the crime charged. "Evidence of uncharged conduct is not 'other crimes' evidence subject to Rule 404 if the uncharged conduct arose out of the same series of transactions as the charged offense, or it [evidence of the uncharged conduct] is necessary to complete the story of the crime on trial." *United States v. Siegel*, 536 F.3d 306, 316 (4th Cir. 2008) (alteration in original) (internal quotation marks omitted); *see also United States v. Wilson*, 624 F.3d 640, 652 (4th Cir. 2010); *United States v. Higgs*, 353 F.3d 281, 311 (4th Cir. 2003). As the Fourth Circuit has also put it, "[o]ther criminal acts are intrinsic when they are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." *United States v. Chin*, 83 F.3d 83, 88 (4th Cir. 1996) (internal quotation marks omitted). "[E]vidence is inextricably intertwined with the evidence regarding the charged offense if it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted." *United States v. Lighty*, 616 F.3d 321, 352 (4th Cir. 2010) (alteration in original) (internal quotation marks omitted).

The evidence the government seeks to introduce, namely, that the defendant controlled H.D. through repeated acts of domestic violence that he explicitly and specifically related to her

6

performance as his underling in a drug distribution scheme, culminating in his assaulting and kidnapping her in retaliation for stealing his cocaine and withholding money or drugs owed to him, is admissible evidence because it is relevant and intrinsic to all charged counts. Alternatively, such evidence is admissible under Federal Rule of Evidence 404(b)(2), which permits evidence of other crimes, wrongs, or acts as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b)(2). [1]

### A. Defendant's Prior Acts of Domestic Violence Against H.D. are Admissible as Intrinsic Evidence

The nature of the relationship between H.D. and the defendant, including the pattern of repeated physical violence and interpersonal control is relevant to an issue other than character, necessary, and reliable for each count charged by the government.    First, the drug conspiracy counts require the government to prove that the defendant knowingly entered into a criminal agreement to pursue an unlawful object. The government will introduce evidence that the defendant entered into an agreement with H.D., among others, in which she would assist him in a drug distribution scheme by delivering cocaine to his customers at his direction, return cash profits to him obtained from his cocaine customers, create fraudulent oxycodone prescriptions, recruit conspirators to pass those fraudulent prescriptions, and return both oxycodone pills and profits from selling those pills to him. Evidence that the defendant repeatedly beat H.D. for

---

1 Defendant argues that evidence that he controlled H.D. through physical violence should be precluded under Federal Rules of Evidence 403, which precludes evidence that is unduly prejudicial. Defendant references Federal Rules of Evidence 609 and 404(b) in his opening paragraph but offers no further reference or argument regarding these Rules.   Rule 609 is irrelevant because the government is not seeking to impeach the defendant through any convictions related to violence against H.D.   Rule 404(b), as argued *infra*, actually permits this evidence as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b)(2).

failing to follow his orders and for failing to turn over cash profits from the sale of cocaine and oxycodone is direct evidence of that agreement between H.D. and the defendant regarding drug sales.

Second, the evidence of prior assaults is equally intrinsic to the charges of kidnapping and interstate domestic violence.    In *United States v. Dietz*, the defendant was charged with kidnapping and the government introduced evidence that the defendant had previously sexually assaulted the victim. *See United States v. Dietz*, 443 F. App'x 781, 791 (4th Cir. 2011). The court held that the prior conduct was intrinsic to the crime and was relevant to show the control the defendant exercised over the victim. *Id*. In the present case, the defendant's prior conduct of assaulting H.D. is intrinsic to the pending charges of kidnapping and interstate domestic violence. Although the alleged conduct is not part of a "single criminal episode," it is "inextricably intertwined" and necessary to complete the story of the charged crime. The history of violence and relationship between the defendant and H.D. provides context for the kidnapping and interstate domestic violence charges, including context for why H.D. initially reported to police that she had been abducted by someone other than the defendant.[2] Additionally, the prior

---

2  The government would note for the Court that in another case in the Eastern District of Virginia, Judge Lee found that prior abuse was not intrinsic evidence in a case where a defendant had been charged with kidnapping and interstate domestic violence. *See United States v. Lentz*, 282 F. Supp. 2d 399, 409, 429 (E.D. Va. 2002), aff'd, 58 F. App'x 961 (4th Cir. 2003). In that case, the defendant allegedly lured his ex-wife into Virginia by holding the daughter they shared custody of, and then murdered the ex-wife once she arrived. *Id*. at 409. In that case, the United States sought to introduce evidence of prior acts of shoving, throwing objects, and physical altercations between the defendant and his ex-wife who he ultimately killed. There, the court found that those prior acts were not "inextricably intertwined with the act of luring [the victim] across state lines to cause her death." *Id*. The court also expressed wariness for the use of intrinsic evidence to "set the stage." *Id*. at 430. Significantly, however, the court did find that the prior acts were admissible to show motive and intent under 404(b).

*Lentz* should be distinguished from the present matter. In *Lentz*, the charged conduct was luring the ex-wife through holding the child, rather than beating the ex-wife – thus the prior assaults against the ex-wife were not intrinsic. In the present case, the charged conduct consists of defendant beginning to assault H.D. and then transporting her into the District of Columbia in his vehicle while he continued to harm her. In this case, physical violence was the actual means used to "seize, confine, kidnap, abduct, and carry away" the victim. The victim's past

conduct is direct evidence of the element of interstate domestic violence requiring the victim be a "a spouse, intimate partner, or dating partner." 18 U.S.C. § 2261(a)(2).

## B.     Defendant's Prior Acts of Domestic Violence are Alternatively Admissible Under Rule 404(b)(2)

Even if this court were to find that evidence relating to prior assaults by the defendant against H.D. were not intrinsic to the charged crimes, such evidence would still be admissible under Federal Rule of Evidence 404(b) because it is highly relevant for non-propensity purposes. The introduction of a defendant's prior crimes, wrong, or other acts "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). The foundation of the rule is to ensure "defendants not be convicted simply for possessing bad character." *United States v. Queen*, 132 F.3d 991, 995 (4th Cir. 1997). However, the defendant's prior acts of domestic violence towards H.D. are admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

For evidence of prior acts to be admissible, the evidence must meet a four-part test derived from Rule 404(b) and Rule 403. *See United States v. Faulls*, 821 F.3d 502, 508 (4th Cir. 2016). The Fourth Circuit requires:

> "(1) The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. In this regard, the more similar the prior act is (in terms of physical similarity or mental state) to the act being proved, the more relevant it becomes. (2) The act must be necessary in the sense that it is probative of an essential claim or

---

experience with being beaten by the defendant affected her experience of being beaten on that occasion, and "forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted." *Lighty*, 616 F.3d at 352.

an element of the offense. (3) The evidence must be reliable. And (4) the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the fact finding process."

*United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997).

The evidence sought to be introduced by the government meets the four-part test articulated in *Queen*.

First, the defendant's prior conduct is relevant for a number of reasons not related to establishing general character. The prior domestic violence conduct establishes the "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, [and] lack of accident" of the defendant. Fed. R. Evid. 404(b)(2). The conduct additionally tends to show the non-consent of H.D. to be abducted and taken away, as well as the defendant's control over H.D. and her state of mind throughout the drug conspiracy period, during which she was being directed and managed by the defendant.[3]

Second, the evidence is necessary under the *Queen* test because it is probative of central elements of the charges. As argued above, these prior acts show the existence of a criminal agreement between at least H.D. and the defendant, a necessary element of the drug conspiracy

---

[3] The Fourth Circuit has previously upheld the admission of similar evidence for similar purposes under the *Queen* test. In *Faulls*, the defendant was charged with kidnapping and interstate domestic violence and at trial, the government introduced evidence of prior threats the defendant had made towards the victim and physical attacks made against the victim. *See United States v. Faulls*, 821 F.3d 502, 505–507 (4th Cir. 2016). The court found that that the prior acts of domestic violence were relevant to the defendant's motive to keep the victim from leaving and control the victim, similar to the charged offense. *Id*. at 508. Further, the court found that the evidence could be relevant to the victim's state of mind, demonstrating the defendant's control and domination over the victim. *Id*.

In *Dietz*, the defendant was on trial for kidnapping and related offenses and the government introduced the defendant's history of domestic violence with the victim. *See United States v. Dietz*, 443 F. App'x 781, 783, 790 (4th Cir. 2011). The court held that a prior arrest for criminal domestic violence and a prior incident where the defendant struck the victim was relevant to the non-consent to traveling with the defendant during the kidnapping and supported the abduction element of the kidnapping. *Id*. at 790. The court found admission of the prior acts of domestic violence was not "needlessly cumulative or unfairly prejudicial under rule 403." *Id*.

10

charges. These same acts show the ongoing nature of a domestic relationship between the defendant and H.D., a necessary element of the interstate domestic violence charge. And they are strongly probative of H.D.'s non-consent during her abduction, a necessary element of the kidnapping charge.

Third, the evidence is reliable. The expected evidence comes from multiple sources, including eyewitness testimony of lay witnesses and co-conspirators, medical records, and the testimony of responding officers. There is no hearsay issue or challenge to the reliability of the evidence. Further, the prior acts occurred close in time to the alleged kidnapping event and during the charged period of the drug conspiracy.

Finally, courts require that the probative value of the evidence must not be substantially outweighed by confusion or unfair prejudice. "Prejudice" does not mean simply that the evidence is harmful to the defendant's case; indeed, most relevant evidence introduced by the government is detrimental to a defendant's case. Rule 403 does not protect a defendant from harmful evidence – it protects against evidence that is *unfairly* prejudicial. Evidence is unfairly prejudicial only if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee's Note, Fed. R. Evid. 403. The acts sought to be admitted by the government are directly related to the "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, [and] lack of accident" of the defendant, as well as the elements of the charged offenses. There is nothing to suggest that the acts in question – which are, relatively speaking, fairly mundane domestic violence incidents – are so egregious or inflammatory that a jury would be unable to fairly judge the conduct. They therefore are admissible under Federal Rule of Evidence 404(b)(2).

11

## Conclusion

WHEREFORE, the government asks the Court to deny the defendant's motion in limine.


Respectfully submitted,

Dana J. Boente
United States Attorney


By:     _____/s/_____
        Sean M. Welsh
        Special Assistant United States Attorney
        Whitney Dougherty Russell
        Assistant United States Attorney
        United States Attorney's Office
        Justin Williams U.S. Attorney's Building
        2100 Jamieson Avenue
        Alexandria, Virginia 22314
        703-299-3700

12

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 11th day of September, 2016, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification

of such filing (NEF) to the defendant's attorney.

_____/s/_____
Whitney Dougherty Russell
Assistant United States Attorney
United States Attorney's Office
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone:   703-299-3700
Fax: 703-299-3981
Email: whitney.russell@usdoj.gov

13