IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Criminal Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | **Case No: 1:16-cr-135** |
| ) | |
| ) | |
| AHMAD SAYED HASHIMI, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)

The Defendant Ahmad Sayed Hashimi, through Counsel, respectfully moves this Court to grant his motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A), and order the remainder of his sentence to be served on home confinement or, in the alternative, issue a non-binding recommendation that the BOP transfer him to home confinement for the duration of his sentence, pursuant to 18 U.S.C. § 3624(c), the CARES Act, and Attorney General Barr's April 3, 2020 Memorandum.  This Motion should be granted because the global COVID-19 pandemic combined with Mr. Hashimi's medical conditions presents an "extraordinary and compelling reason" for compassionate release.

Mr. Hashimi is particularly susceptible to COVID-19 and is more likely to suffer dire consequences from the virus due to his medical conditions.  There are 6,553 federal inmates and over 700 BOP staff who have confirmed positive test results for COVID-19 nationwide.  There have been 89 federal inmate deaths and 1 BOP staff

member death attributed to COVID-19 disease.[1] Mr. Hashimi is incarcerated at FCI Gilmer, where 6 inmates contracted the virus.[2]  Mr. Hashimi is exposed to a particularized risk of contracting the disease.  The virus thrives in densely packed populations, and FCI Gilmer is ill-equipped to contain the pandemic and prevent COVID-19 from spreading to inmates like Mr. Hashimi.  Mr. Hashimi's release date is July 31, 2037. Allowing him to finish out the remaining of his sentence at his parent's house, where he would reside along with his siblings, is the only prudent and just response to the extraordinary and compelling circumstances created by the novel coronavirus.

Mr. Hashimi's release plan adheres to the mandates of Section 3553(a), particularly in light of the cataclysmic events of the current pandemic.  We respectfully ask the Court to consider this motion on an expedited basis as the risk to Mr. Hashimi's life multiplies exponentially with each passing day.

## FACTUAL BACKGROUND

On December 19, 2016 Mr. Hashimi was found guilty of the following charges: 1) Conspiracy to Distribute Oxycodone, in violation of 21 U.S.C. §§ 841(a)(1) and 846; 2)  Conspiracy to Distribute Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846; 3) Kidnapping, in violation of 18 U.S.C. § 1201(a)(1); and 4) Interstate Domestic Violence, in violation of 18 U.S.C. § 2261(a)(2). *See Presentence Report, at* ¶2.  At least ten (10) co-conspirators were prosecuted in the Eastern District of Virginia.

---

[1] Federal Bureau of Prisons, Covid-19, June 9, 202,  https://www.bop.gov/coronavirus/index.jsp
[2] *Id.*

Many were given light sentences and, in some cases not even prosecuted. See ¶ 6. None of Mr. Hashimi's Co-conspirators were sentenced to an active period of incarceration of more than forty-eight (48) months. See ¶¶ 6 – 16. Mr. Hashimi was sentenced to 300 months of imprisonment, 5 years suspended, which he has been serving at FCI Gilmer since April 16, 2016.

There have been 6 confirmed cases of Corona virus at FCI Gilmer, where Mr. Hashimi is incarcerated and the number of cases has been increasing in the last months in the state of West Virginia, where FCI Gilmer is located.

Mr. Hashimi has requested that the Warden at Gilmer File a Compassionate Release Motion due to his medical condition. *See Exhibit 1.* Mr. Hashimi is also requesting that the Warden at Gilmer move for compassionate release on the same grounds as submitted herein. Because of the urgency of the spread of COVID-19, both nationally and within the federal prison system, we respectfully ask the Court to waive the 30-day waiting period after this submission for the Court to order compassionate release. Delaying resolution of Mr. Hashimi's motion would expose Mr. Hashimi to undue prejudice considering the rapid development of the pandemic and the significant risk of death.[3]

---

[3] As an alternative to granting immediate relief, the Court may also defer ruling on this motion until the end of the 30-day waiting period. Courts have recognized that § 3582(c)(1)(A)'s 30-day waiting period does not prevent a defendant from *filing* a motion for compassionate release prior to the expiration of the 30-day waiting period. *See United States v. Gross*, 2020 WL 1862251 (S.D.N.Y. Apr. 13, 2020) (deferring compassionate release grant until 30 days after the warden's receipt of the defendant's request for compassionate release).

## SUMMARY OF ARGUMENT

*First*, the Court should exercise its authority to grant Mr. Hashimi's Motion for Compassionate Release without requiring full exhaustion or "the lapse of 30 days" from the warden's receipt of Mr. Hashimi's request. See 18 U.S.C. § 3582(c)(1)(A). In response to the COVID-19 pandemic, courts across the country have waived the 30-day waiting period in light of the extraordinary circumstances posed by the pandemic and Congress's intent in enacting the First Step Act's compassionate release provision. The First Step Act amended § 3582 to eliminate the BOP as the sole gatekeeper of compassionate release in response to the BOP's failure to "properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered."[4] The First Step Act also expanded and expedited access to compassionate relief by allowing defendants to file motions for such relief themselves as early as 30 days after submitting a request to a warden asking for the BOP to file such a motion, or the completion of an administrative appeal process, whichever occurs sooner. Treating this 30-day waiting period as a jurisdictional *bar* to the Court's resolution of Mr. Hashimi's Motion would frustrate Congress's manifest intent, contradict Supreme Court guidance, and expose Mr. Hashimi to undue prejudice.

---

[4] Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program*, at 11 (April 2013); *see also* Department of Justice, Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, at 51 (May 2015) ("Although the BOP has revised its compassionate release policy to expand consideration for early release to aging inmates, which could help mitigate the effects of a growing aging inmate population, few aging inmates have been released under it.").

**Second,** the COVID-19 pandemic in combination with Mr. Hashimi's unique susceptibility to COVID-19 given his serious medical issues – which independently expose him to grave risks according to the Center for Disease Control – is an "extraordinary and compelling" reason to grant Mr. Hashimi compassionate release. In just a matter of weeks, federal courts nationwide have acknowledged that COVID-19 constitutes an extraordinary and compelling basis for ordering compassionate release for defendants facing a rapidly growing mortal threat from exposure to the coronavirus in federal prisons.[5]

This Court should exercise its authority to grant Mr. Hashimi compassionate release. There can be no doubt that, as long as Mr. Hashimi remains incarcerated, Mr. Hashimi faces an unacceptable risk of contracting and dying from COVID-19. As of June 29, 2020, BOP reported 1,442 federal inmates and 143 BOP staff who are currently positive for COVID-19 nationwide, including 89 federal inmate deaths.[6] More than 6, 700 federal inmates have been affected with the virus. These reported cases under-estimate COVID-19's real toll given the lack of adequate testing in BOP facilities.[7] On April 10, 2020, BOP Director Michael Carvajal stated that "more than 30% of our federal prisons are currently affected," including 43 BOP facilities and 13

---

[5] *See infra,* Appendix of Authority: Courts Granting Compassionate Release in Light of COVID-19.

[6] Fed. Bur. of Prisons, COVID-19 Tested Positive Cases, available at https://www.bop.gov/coronavirus/

[7] *See, e.g., Louisiana federal prison no longer testing symptomatic inmates for coronavirus due to 'sustained transmission',* The Lens (Mar. 31, 2020), available at https://thelensnola.org/2020/03/31/louisiana-federal-prison-no-longer-testing-symptomatic-inmates-for-coronavirus-due-to-sustained-transmission/

Residential Re-Entry Centers, and "institutions such as Oakdale, Elkton, Danbury, Lompoc, Butner, Yazoo City, Forrest City, and Milan are 'hotspots' for COVID-19."[8] As of today, 100% of federal prisons has been affected with the virus. [9]

The alarming spread of COVID-19 in BOP facilities confirms that, despite BOP's efforts in reaction to COVID-19, BOP cannot adequately safeguard prisoners.[10] Prisoners cannot provide self-care because their incarceration prevents them from following CDC guidance: "People in jails and prisons cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain specific products for cleaning and laundry, avoid frequently touched surfaces, or sanitize their own environment." *United States v. Skelos*, 15-CR-317 (KMW), 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020).

*Third*, the Section 3553(a) factors warrant Mr. Hashimi's release.

## ARGUMENT

### I.    The Court Has Jurisdiction to Grant Mr. Hashimi Compassionate Release Without Delay.

On December 21, 2018, the First Step Act became law. Among the criminal justice reforms enacted in this landmark legislation, Congress amended 18 U.S.C.

---

[8] BOP Direct Michael Carvajal's Message to Prison Staff (Apr. 10, 2020), Transcript available at https://prisonology.com/wp-content/uploads/2020/04/COVID-19-Video-transcript-of-BOP-Director-Michael-Carvajal.pdf

[9] Fed. Bur. of Prisons, COVID-19 Tested Positive Cases, available at https://www.bop.gov/coronavirus/

[10] Developments in non-federal institutions further evidence these concerns. *See also A Jail in Chicago Is Now the Largest-Known Source of U.S. Infections*, N.Y. Times (Apr. 8, 2020), https://www.nytimes.com/2020/04/08/us/coronavirus-live-updates.html#link-7634e187; Megan Flynn, *Top Doctor at Rikers Island Calls the Jail a 'Public Health Disaster Unfolding Before Our Eyes'*, Wash. Post (Mar. 31, 2020), https://www.washingtonpost.com/nation/2020/03/31/rikers-island-coronavirus-spread/.

§ 3582(c)(1)(A)(i) to allow, for the first time, defendants to move for a reduction of sentence based upon extraordinary and compelling reasons whenever "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, *whichever is earlier*[.]" First Step Act of 2018, § 603(b), Pub. L. 115- 391, 132 Stat. 5194, 5239 (Dec. 21, 2018). By providing this exceptionally short 30-day waiting period before a court may act on a defendant's motion for compassionate release, Congress plainly sought to expedite judicial consideration of such motions and expedite defendants' access to the courts. *See, e.g., United States v. Haney*, 19-cr-541 (JSR), 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020).

In this case, while the 30-day waiting period has not yet passed, this Court should address this Motion without delay. Section 3582(c)(1)(A)'s 30-day waiting period is simply a claims processing rule, not a jurisdictional bar to the Court's authority to order compassionate release. Accordingly, the 30-day waiting period provision is subject to well-recognized exceptions that apply here. Due to mortal threat posed by the rapid spread of the virus in prison populations, and Mr. Hashimi's particular susceptibility to serious illness and death from the virus, requiring a 30-day delay in this Court's granting of this Motion would be futile and cause Mr. Hashimi undue prejudice.

A. <u>The 30-day waiting period is not a jurisdictional requirement and therefore may be waived.</u>

The Supreme Court has "stressed the distinction between jurisdictional prescriptions and non-jurisdictional claim-processing rules, which seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." *Fort Bend Cty., Texas v. Davis*, 139 S. Ct. 1843, 1849 (2019); *see Henderson v. Shinseki*, 562 U.S. 428, 435 (2011) (claims processing rules "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times"). To distinguish between the two, courts must apply a "readily administrable bright line" standard. *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013). Specifically, the Court inquires whether Congress has "clearly stated that the rule is jurisdictional." *Id.* (citation omitted). When "Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." *Davis*, 139 S. Ct. at 150 (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006)).

Courts apply the "clear statement" bright line standard by "considering the statutory text (if it speaks in 'jurisdictional terms'); the placement of the rule (if it is located in the jurisdiction-granting provision of the statute); and legislative context." *Stewart v. Iancu*, 912 F.3d 693, 699-700 (4th Cir. 2019). All of these considerations establish that the administrative exhaustion provisions of 18 U.S.C. § 3582(c)(1)(A)(i) functions merely as a claims processing rule, not a jurisdictional requirement.

Though the Fourth Circuit has not specifically addressed whether the 30-day waiting period in § 3582(c)(1)(A) is jurisdictional,[11] it has provided instructive guidance in addressing a similar exhaustion provision in Title VII. *See Stewart*, 912 F.3d at 699-704. Section 2000e-16(c) of Title VII allows employees and job applicants to bypass administrative exhaustion of their discrimination claims when a government agency fails to "take final action" within 180 days of filing an initial complaint. The Title VII exhaustion scheme bears similarities to the 30-day waiting period under § 3582(c)(1)(A).

As the Fourth Circuit noted, "[u]nlike most administrative exhaustion requirements premised on agency action . . . the 180-day waiting period is satisfied by agency *inaction*," *id.*, like the 30-day waiting period under § 3582(c)(1)(A). Moreover, "Congress passed Section 2000e-16(c) of Title VII in 1972 precisely because of its recognition that federal employees frequently encountered an 'administrative quagmire' in filing charges of discrimination," *id.* at 699, which is similar to Congress's purpose in amending § 3582(c)(1)(A) in the First Step Act. The Fourth Circuit thus concluded that Title VII's 180-day waiting period is "akin to a 'claim-processing' rule that imposes procedural obligations on litigants . . . [and] is not jurisdictional." *Id.* at 701. The same reasoning applies here.

---

[11] The Fourth Circuit has held that the implicit prohibition on motions to reconsider a sentence reduction pursuant to § 3582(c)(2) based upon a retroactive amendment to the Sentencing Guidelines is not jurisdictional and may be waived. *See United States v. May*, 855 F.3d 271, 274-75 (4th Cir. 2017) (recognizing a "nonjurisdictional" bar to § 3582*(c)(2)*-based motions for reconsideration).

There are additional reasons to conclude that the 30-day waiting period is not a jurisdictional pre-requisite to judicial review. First, the statutory text of § 3582(c)(1)(A does not address the courts' jurisdiction; it merely promotes the "orderly progress of litigation" by stipulating *which party* will file a compassionate release motion, and allows prisoners to move on their own behalf after 30 days from BOP receipt of an inmate's request to file such a motion. "A statutory condition that requires a party to take some action before filing a lawsuit is not automatically 'a *jurisdictional* prerequisite to suit'"; instead, "the jurisdictional analysis must focus on the 'legal character' of the requirement." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166 (2010) (emphasis in original); *see also Stewart v. Iancu*, 912 F.3d at 701 ("Simply because [Title VII's] 180-day waiting period is 'cast in mandatory language' does not render it jurisdictional."). And here, the legal character of the 30-day waiting period "simply delineates the process for a party to obtain judicial review, [and does] not refer[] to the adjudicatory capacity of courts." *United States v. Haney*, 19-cr-541 (JSR), 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020) (concluding that the exhaustion requirement in § 3582(c)(1)(A) is a claim-processing rule that does not deprive this Court of jurisdiction" and that the court "has the discretion to waive the exhaustion requirement § 3582(c)(1)(A)").

In other words, the 30-day waiting period provision is not designed to allow the BOP time to provide the relief sought by the defendant, potentially to avoid the need for judicial review. Such review is required regardless of whether a compassionate release motion is filed by the defendant or the BOP. The provision thus "does not reflect unqualified commitment to administrative exhaustion," to the contrary, it

10

"reflect[s] acknowledgement that the judiciary has an independent interest in, and responsibility for, the criminal judgments it is charged with imposing." *United States v. Russo*, 16-cr-441 (LJL), 2020 WL 1862294, at *6 (S.D.N.Y. Apr. 14, 2020) (emphasis added).

Second, the exhaustion requirement is not placed in the jurisdiction-granting provision of the statute; it is in the "part of the chapter dealing generally with sentences of imprisonment." *See United States v. Taylor*, 778 F.3d 667, 671 (7th Cir. 2015). "Tellingly, the word 'jurisdiction' or its variation never appears" in § 3582. *Haney*, 2020 WL 1821988, at *3. Moreover, § 3582 as a whole expressly *confirms* the courts' sentencing modification authority. Though § 3582(c) states that the "court may not modify a term of imprisonment once it has been imposed," that provision follows § 3582(b), which states that "a sentence to imprisonment can subsequently be" modified, corrected, or appealed and modified "pursuant to" certain provisions. In short, there is no indication that § 3582(c)(1)(A) divests or conditions the courts' jurisdiction on the 30-day waiting period. Instead, it merely sets forth a procedure "pursuant to" which sentence modifications are made.

Third, the legislative context surrounding the First Step Act – which removed the BOP as the sole gatekeeper of compassionate release, and expedited defendants' access to the courts – confirms that the exhaustion provision is not jurisdictional. In allowing defendants to seek compassionate release directly from federal courts, Congress implemented a modest procedural hurdle – "either exhaust or wait 30 days" – that "substantially reduces the importance" of protecting BOP authority by allowing "a defendant to come to court before the agency has rendered a final decision." *Haney*,

11

2020 WL 1821988, at *3. Moreover, Congress amended § 3582 to allow defendants to seek redress directly from federal courts following the Department of Justice Inspector General's critical assessment of the previous compassionate release framework: "not all [BOP] institutions have timeliness standards, and for those institutions that do, the timeframe ranges from 5 to 65 days"; "the process available to inmates to appeal a Warden's or Regional Director's denial of a compassionate release request can take up to more than 5 months to complete"; and that "BOP cannot determine if requests are processed in a timely manner because the BOP does not track the time it takes to approve or deny requests."[12]

Congress's intent in amending the statutory framework for compassionate release strongly weighs in favor of the conclusion that courts have the authority to waive the 30-day waiting period under the current circumstances. Given "the multiple demands that the BOP has faced for many years in this era of mass incarceration [the Court] can reasonably infer that Congress recognized that there would be many cases where the BOP either could not act within 30 days on such a request or, even if it did act, its review would be superficial." *Haney*, 2020 WL 1821988, at *3. But the statutory text reflects that "Congress was determined not to let such exigencies interfere with the right of a defendant to be heard." *Id.*

Consequently, Congress's provision for prompt judicial review is even more critical in light of the deadly and rapidly spreading COVID-19 pandemic. *Id.* "In essence, the 30-day rule was meant as an accelerant to judicial review . . .. and it

---

[12] Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program*, at ii-iii (April 2013).

would pervert congressional intent to treat it as a substantial obstacle to effective judicial review." *United States v. Russo*, No. 16-cr-441 (LJL), ECF No. 54, at 5 (S.D.N.Y. Apr. 3, 2020).[13] Accordingly, when "BOP has not been able to satisfy its obligation to act expeditiously . . . or to assure the Court it can do so . . . the Court can exercise the power Congress has given it" in the extraordinary circumstances of COVID-19. *Russo*, 2020 WL 1862294, at *7.

        B.  <u>The Court should waive exhaustion because Mr. Hashimi is at grave risk of contracting a fatal disease and pursuing administrative remedies would be futile and unduly prejudicial.</u>

Because the § 3582(c)(1)(A) waiting period is non-jurisdictional, the Court may excuse Mr. Hashimi's failure to exhaust his administrative remedies if: (1) exhaustion would be futile; (2) the administrative process is incapable of granting adequate relief; or (3) pursuing agency review would subject Mr. Hashimi to undue prejudice. *See, e.g., Orr v. Assurant Employee Benefits*, 786 F.3d 596, 602 (7th Cir. 2015).[14]

---

    [13] *Cf. Gonzalez v. Thaler*, 565 U.S. 134 (2012) ("Treating § 2253(c)(3) as jurisdictional also would thwart Congress' intent in AEDPA to eliminate delays in the federal habeas review process.") (quotation omitted); *Stewart*, 912 F.3d at 703 ("Our conclusion also comports with the broader purpose of Title VII as a remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process.").

    [14] *See also Garza v. Davis*, 596 F.3d 1198, 1203-04 (10th Cir. 2010) (recognizing futility exception in context of § 2241 petition); *Woodall v. Federal Bureau of Prisons*, 432 F.3d 235, 239 n.2 (3d Cir. 2005) ("[E]xhaustion would be futile, given that Woodall is not challenging the application of the BOP regulations, but their validity."); *Elwood v. Jeter*, 386 F.3d 842, 844 n.1 (8th Cir. 2004); *Fournier v. Zickefoose*, 620 F.Supp.2d 313, 317 (D. Conn. 2009); *Boucher  v. Lamanna*, 90 F.Supp.2d 883, 887 (N.D. Ohio 2000) (concluding that exhaustion of administrative remedies would be futile where the BOP's policy on categorizing the prisoner's offense as a violent crime was mandatory, the issue was a legal one that BOP had

13

Indeed, given COVID-19's unprecedented and unique threat to people confined to prisons, courts throughout the country have applied these well-recognized exceptions in waiving exhaustion under the First Step Act. *See, e.g., Haney*, 2020 WL 1821988, at *4 (S.D.N.Y. Apr. 13, 2020) ("Congressional intent not only permits judicial waiver of the 30-day exhaustion period, but also, in the current extreme circumstances, actually ***favors*** such waiver, allowing courts to deal with the emergency before it is potentially too late.") (emphasis added); *United States v. Jones*, No. 3:11-cr-249, Dkt. No. 47 (E.D. Va. Apr. 3, 2020) ("Given Jones's unique circumstances and the exigency of a rapidly advancing pandemic, requiring Jones to exhaust administrative remedies would result in undue prejudice and render exhaustion of the full Bureau of Prisons administrative process both futile and inadequate.").[15]

_____

consistently defended, and the potential for immediate release counseled timely consideration of petitioner's case).

[15] *See also United States v. Sawicz*, 08-cr-287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020) ("The delay that the defendant would experience if he had to wait for thirty days to expire before pursuing a motion for compassionate release in this court would put him at significant risk of suffering catastrophic health consequences."); *United States v. Colvin*, No. 19-cr-179, 2020 WL 1613943, at * 2 (D. Conn. Apr. 2, 2020) (requiring exhaustion would subject defendant to "undue prejudice – the heightened risk of severe illness – while attempting to exhaust her appeals"); *United States v. McCarthy*, No. 3:17-CR-0230, 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020) (waiving exhaustion where defendant's "age and underlying health issues, when considered in light of the spread of COVID-19, demonstrate that further delay could likely result in such catastrophic health consequences, including death"); *United States v. Zukerman*, 16 CR 194, 2020 WL 1659880, at *4 (S.D.N.Y. Apr. 3, 2020) (Defendant's "advanced age and compromised health, combined with the high risk of contracting COVID-19 at Otisville, justify waiver of the exhaustion requirement."); *United States v. Perez*, No. 17-cr-513-3, 2020 WL 1546422, at *1 (S.D.N.Y. Apr 1, 2020) (Defendant's "exhaustion of the administrative process [under the First Step Act] can be waived in light of the

Pursuing administrative remedies would be futile in this case because BOP has presumptively deemed Mr. Hashimi ineligible for relief. BOP represents that, on March 26, it "began immediately reviewing all inmates who have COVID-19 risk factors . . . to determine which inmates are suitable for home confinement."[16] Because BOP has not identified Mr. Hashimi for early release or home confinement, and because BOP has made no representation that it intends to grant Mr. Hashimi's request, the Court can find that BOP has deemed Mr. Hashimi unsuitable for home confinement or early release. Accordingly, it would be futile for Mr. Hashimi to pursue his administrative remedies.

Second, any relief that could be granted through the administrative process would be plainly inadequate because it would require Mr. Hashimi to suffer irreparable harm by continuing to face the lethal threat of COVID-19. BOP typically takes months to address the requests of inmates for compassionate release even under better conditions.[17]   Given the pandemic, the system is undoubtedly overwhelmed with new requests – a reality that will further bog down and delay the process, all the while exposing Mr. Hashimi to an increasing risk of infection, serious illness, and even death. Exposing Mr. Hashimi to that increasing risk is an irreparable harm that renders relief inadequate.

---

extraordinary threat posed – in his unique circumstances – by the COVID-19 pandemic.").

[16] Fed. Bur. of Prisons, COVID-19 Home Confinement Information, available at https://www.bop.gov/coronavirus/

[17] See BOP Report on Compassionate Release, at ¶G (showing that nonterminal-illness compassionate release requests took on average between 58 and 117 days to be addressed by the BOP).

Finally, forcing Mr. Hashimi to exhaust his administrative remedies will be unduly prejudicial. Mr. Hashimi's health is negatively impacted by the outbreak even though he has not yet been infected: The conditions at BOP prejudice Mr. Hashimi's ability to follow the hygiene and social distancing recommendations of the CDC, which prejudices his ability to avoid infection, in an environment extremely conducive to spread. Finally, and most importantly, if the virus reaches Mr. Hashimi, it very well could make him extremely ill or kill him, a prejudice that is definitely undue.[18]

In these dire circumstances, the Court should waive the administrative exhaustion requirement in § 3582.

## II. This Court Possesses Statutory Authority to Modify Mr. Hashimi's Sentence Due to Mr. Hashimi's Age, Medical Conditions, and the Threat Posed by COVID-19.

This Court has authority to order Mr. Hashimi's immediate release or in the alternative: into home confinement. Section 3582(c)(1)(A)(i) states in relevant part that the Court "may reduce the term of imprisonment, after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a

---

[18] A Connecticut state prisoner who was approved for discretionary release died after contracting COVID-19 while attempting to locate an appropriate home sponsor. *CT inmate approved for release dies with coronavirus*, CT Post (April 13, 2020), available at https://www.ctpost.com/news/coronavirus/article/Inmate-approved-for-release-dies-with-COVID-19-15198054.php

16

reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]"

When enacting § 3582(c) as part of the Crime Control Act of 1984, Congress tasked the Sentencing Commission with defining the phase "extraordinary and compelling," and also required that any judicial order modifying a sentence be "consistent with applicable policy statements" issued by the Sentencing Commission. *See* 28 U.S.C. § 994(t). The Sentencing Commission followed the directive and issued a policy statement, but that policy statement has not been updated to reflect changes made by the First Step Act of 2018.[19]

The Commission's current policy statement further sets forth the following factual considerations for determining whether compassionate release is appropriate: (i) the medical condition of the defendant (including terminal illness and other serious conditions and impairments); (ii) the age of the defendant (for those 65 and older with serious deterioration related to aging who have completed at least 10 years or 75 percent of the term of imprisonment); (iii) the family circumstances of the defendant (where a child's caregiver or spouse dies or becomes incapacitated without an alternative caregiver); and (iv) "other reasons" as determined by the BOP. U.S.S.G. § 1B1.13, Application Note 1(A).  The fourth category specifically includes "an

---

[19] Since the passage of the First Step Act, there have not been enough commissioners to update the Commission's policies or amend the Sentencing Guidelines. *See United States v. Brown*, No. 4:05-CR-00227-1, 2019 WL 4942051 at *2 n.1 (S.D. Iowa Oct. 8, 2019) ("As district courts have noted often this year, the Sentencing Commission has not amended the Guidelines following the First Step Act and cannot do so until it again has four voting commissioners.").

extraordinary and compelling reason other than, or in combination with," the first three. *Id.*[20]

It is the Courts' role to determine what "other reasons" warrant compassionate release, notwithstanding the Commission's outdated policy statement that provided for BOP to make that determination. "Under the First Step Act, it is for the court, not the Director of the Bureau of Prisons, to determine whether there is an 'extraordinary and compelling reason' to reduce a sentence." *United States v. Maumau,* 2:08-cr-758-TC, 2020 WL 806121, at *7-8 (D. Utah Feb. 18, 2020). Numerous courts have recognized the judicial authority to find that compassionate release is warranted for "other reasons" than those set forth in U.S.S.G. § 1B1.13. *See, e.g.*, *United States v. Redd,* Case No. 1:97-cr-00006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020) ("[T]he Court joins other courts in concluding that a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C)").[21]

---

[20] Additionally, the commentary makes clear that the extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." U.S.S.G. § 1B1.13, Application Note 2. In other words, even if an "extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court, [that fact] does not preclude consideration for a [sentence] reduction." *Id.*

[21] *See also United States v. Perdigao,* No. 07-103, 2020 WL 1672322, at *2 (E.D. La. Apr. 2, 2020) ("Many courts have concluded that . . . the Sentencing Commission does not have a policy position applicable to motions for compassionate release filed by defendants pursuant to the First Step Act."; *United States v. Rodriguez,* No. 2:03-cr-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020) (""the scope of the old policy statement is clearly outdated and, at the very least, does not apply to the entire field of post-First Step Act motions . . . . Therefore, the policy statement may provide 'helpful guidance' but does not limit the Court's

III.   **The COVID-19 Pandemic Presents an Extraordinary and Compelling Reason for Mr. Hashimi's Compassionate Release Due to Mr. Hashimi's Particular Vulnerability.**

A. **COVID-19 presents a national and global emergency.**

Since January 2020, COVID-19 has spread widely – and rapidly – throughout the United States.  Positive cases have been confirmed in all 50 states, the District of Columbia, Puerto Rico, Guam, the Northern Mariana Islands, and the U.S. Virgin Islands.[22]  Since March 21, 2020, the total number of confirmed cases in the United States has skyrocketed from 15,219 to 2,638,086 as of June 29, 2020; the number of deaths have risen more than 2500-fold, from 201 to 502,947 *Id.*  As of June 29, 2020, the Bureau of Prisons reported that 6700 inmates and 717 staff members tested positive for COVID-19. More than 89 prisoners in its facilities have died of COVId-19.  *See* Fed. Bur. of Prisons, COVID-19 Tested Positive Cases, available at https://www.bop.gov/coronavirus/.  Mr. Hashimi is detained at FCI Gilmer, where there were more than 6 confirmed cases. *Id.*

These numbers are growing exponentially, and almost certainly understate the problem, as the United States in general, and prisons in particular, are vastly behind where they need to be in testing for this virus.  Given the rapid onset of symptoms

---

independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i).""); *United States v. Cantu-Rivera*, No. H-89-204, 2019 WL 2578272, at *2 n.1 (S.D. Tex. June 24, 2019) ("Because the current version of the Guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provisions must be given effect." (internal citation omitted).

[22] *See* CDC, *COVID-19 Cases in the US*, available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

and the fact that many people are asymptomatic at the outset, the unfortunate reality is that once there is a positive case, it may be too late to prevent further spread.

**B. Mr. Hashimi faces a significantly higher risk of contracting COVID-19 because of the conditions of confinement.**

The nation's prison system is particularly ill-equipped to handle the spread of a disease as contagious and deadly as COVID-19. COVID-19 can enter a detention facility and spread rapidly, *entirely undetected.* Indeed, the Director of the CDC recently warned that up to 25 percent of people infected with COVID-19 "may not show symptoms."[23] The virus has already spread rapidly in BOP and state facilities.[24] Due to the crowded and confined nature of a detention facility, the spread of the virus in the prisons and jails is far outpacing its spread in the community.

---

[23] Apoorva Mandavilli, "Infected but Feeling Fine: The Unwitting Coronavirus Spreaders," *New York Times* (March 31, 2020) available at https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html (last visited Apr. 1, 2020). *See also* CDC, "How Coronavirus Spreads" webpage ("Some spread might be possible before people show symptoms; there have been reports of this occurring with this new coronavirus . . ."), available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Ftransmission.html (last visited Apr. 1, 2020)

[24] *See* Timothy Williams, Benjamin Weiser and William K. Rashbaum, "'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars," *New York Times* (Mar. 30, 2020), *available at* https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html (last visited April 1, 2020) ("Hundreds of Covid-19 diagnoses have been confirmed at local, state and federal correctional facilities — almost certainly an undercount, given a lack of testing and the virus's rapid spread — leading to hunger strikes in immigrant detention centers and demands for more protection from prison employee unions").

Conditions of confinement create the ideal environment for the transmission of contagious disease.[25]   "Prisons are petri dishes for contagious respiratory illnesses."[26] Inmates cycle in and out of jails and prisons, and people who work in the facilities leave and return daily.  According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[27] *See Exhibits 2-4.*

Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[28]  The conditions of confinement not only affect incarcerated individuals, but also the community at large. "With 2.3 million people in the United States in prison or jail on any given day, an outbreak in these facilities poses a threat to the entire country."[29]

---

[25] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, at https://doi.org/10.1086/521910.

[26] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons,* Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

[27] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

[28] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks,* The Verge (Mar. 7, 2020) at https://bit.ly/2TNcNZY.

[29] *Explainer: Prisons and Jails Are Particularly Vulnerable to COVID)-19 Outbreaks,* The Justice Collaborative, available at https://thejusticecollaborative.com/wpcontent/uploads/2020/03/TJCVulnerabilityofPrisonsandJailsto COVID19Explainer.pdf.

In granting compassionate release, courts acknowledge that defendants are at grave risk *despite* BOP precaution. "Even in the best run prisons, officials might find it difficult if not impossible to follow the CDC's guidelines for preventing the spread of the virus among inmates and staff: practicing fastidious hygiene and keeping a distance of at least six feet from others." *United States v. Esparza*, No. 1:07-cr-00294-BLW, 2020 WL 1696084 (D. Idaho. Apr. 7, 2020); *see also United States v. Muniz*, Case No. 4:09-cr-199, 2020 WL 1540325, at *1 (S.D. Tex. Mar. 30, 2020) ("[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers . . . demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection.").

Accordingly, Courts in the Fourth Circuit and across the country have concluded that a defendant's vulnerability to COVID-19 constitutes an "extraordinary and compelling reason" in favor of compassionate release. *See, e.g.*, *United States v. Jones*, No. 3:11-cr-249 (E.D. Va. Apr. 3, 2020) (granting compassionate release and converting remainder of sentence to home confinement in light of "the current public health crisis caused by COVID-19"); *United States v. Edwards*, No. 6:17-cr-3-NKM, 2020 WL 1650406, at *6 (W.D. Va. Apr. 2, 2020) (granting compassionate release); *United States v. Collins*, No. CCB-10-336, 2020 WL 1506176 (D. Md. Mar. 30, 2020) (granting compassionate release to a "non-violent drug offender who has already served a lengthy sentence" even though "it has not been proffered that [defendant] has an underlying health condition which makes him more susceptible to the effects of the virus, and while the risks posed by a defendant's continued residence in a detention

facility do not necessarily mandate release"); *United States v. Copeland*, Case No. 2:05-CR-135-DCN (D.S.C. Mar. 24, 2020) (granting compassionate release in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments defendant has during this current pandemic"). Indeed, one court has noted that "the persuasive precedent for granting compassionate release under the current circumstances is overwhelming." *Miller v. United States*, No. 16-20222-1, 2020 WL 1814084 (E.D. Mich. Apr. 9, 2020).[30]

Finally, this Court has recognized that the "gross disparity" between the sentence that the defendant received and the sentence that he would have received after passage of the First Step Act presented an "extraordinary and compelling reason" for compassionate release. *United States v. Redd*, Case No. 1:97-CR-00006-AJT, 2020 WL 1248493 (E.D. Va. Mar. 16, 2020). Although this decision did not address the coronavirus (it was not at issue), it speaks to the issue presented here: if Mr. Hashimi is not released, he faces a potential death sentence, which is not what Congress or the Court intended at sentencing. *See, e.g., Edwards*, 2020 WL 1650406, at *6 ("Had the Court known when it sentenced Defendant in 2018 that the final 18 months of his term in federal prison would expose him to a heightened and substantial risk presented by the COVID-19 pandemic on account of Defendant's compromised immune system, the Court would not have sentenced him to the latter 18 months.")

---

[30]*See infra*, Appendix of Authority: Courts Granting Compassionate Release in Light of COVID-19.

### C. **Mr. Hashimi is more likely to suffer severe or fatal effects of COVID-19 because of his health conditions.**

People with preexisting health issues are particularly at risk of experiencing severe side effects or death as a result of this virus. According to the CDC, people with high-risk conditions, such as chronic neurological conditions, people with lung disease, people who are immunocompromised,[31] are at high risk for severe illness from COVID-19.[32]

Mr. Hashimi suffers from asthma attacks since childhood. He has suffered from more than 100 hundred asthma attacks in prison. He also suffers from a heart condition and he was hospitalized with acute respiratory arrest for more than 16 days at one time. He has suffered two heart attack, one stroke and he has been in coma three times, as a result of drug overdoses that debilitated his body and attacked his vital organs. As a result of the last stroke, he has no sensibility in the left leg. He also suffered from a severe lung inflammation and seizures. He suffers from continuous numbness in feet and hands and he suffered a cardiac arrest in July 2015. He is currently taking albuterol. This critical condition that Mr. Hashimi at risk of severe illness from COVI-19. He also suffers from depression, anxiety and hallucinations, mental health issues that have been proven to work as

---

[31] Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of cortisteroids and other immune weakening medications.

[32] *See* CDC, *People Who are at Higher Risk*, available at https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html.

immunosuppressors, because these conditions cause the chronic release of stress hormones, which then impair the immune system.[33]

Mr. Hashimi has been under the care of medical doctors his entire life to monitor his asthma and lung condition.

Mr. Hashimi's condition place him within the group of people the Center for Disease Control and Prevention ("CDC") has categorized as most-at-risk for contracting COVID-19 and develop the most severe form of the disease. Mr. Hashimi's health history shows that Mr. Hashimi is at a significantly higher risk for serious illness or death. Indeed, CDC guidelines provide that individuals with serious neurological and respiratory illnesses are at a higher risk for severe illness from COVID-19, including death. This is a disease that attacks the nervous system and vital organs.

Hashimi is thirty-seven (37) years old. Data from the Centers for Disease Control and Prevention (CDC) shows that nearly 40 percent of patients hospitalized from coronavirus were 20 to 54 years old.[34] In West Virginia, where Mr. Hashimi is incarcerated, 19- to 49-year-olds comprise over half of all cases in the state.[35] With the recent and dramatic spike in cases that indicates community spread, we must

---

[33] *See How does depression lower the immune system,* Jens Mowatt, B.A. Psychology, Simon Fraser University (2018) available at https://www.quora.com/How-does-depression-lower-your-immune-system-causing-more-colds-and-flu

[34] *Younger Adults Make Up Big Portion of Coronavirus Hospitalizations in U.S.,* The New York Times (Mar. 20, 2020), at https://www.nytimes.com/2020/03/18/health/coronavirus-young-people.html (last visited March 31, 2020).

[35] *See supra* note 6.

take every necessary action to protect not only vulnerable populations, but the community at large.

### IV. Releasing Mr. Hashimi is appropriate given Mr. Hashimi's history and characteristics and his rehabilitation while incarcerated.

In determining whether Mr. Hashimi's sentence should be reduced based on an "extraordinary and compelling reason," this Court must consider whether Mr. Hashimi presents a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g). *See* U.S.S.G. § 1B1.13(2). Under the present statutory regime, the existence of extraordinary and compelling circumstances confers on this Court the authority to consider the relevant 18 U.S.C. § 3553(a) factors in determining whether a sentence reduction is appropriate.

### A. Danger to Society

In addressing a defendant's potential danger to the community, courts have found that granting release in the context of the COVID-19 pandemic better ensures public safety by decreasing the prison population. In a recent decision, the district court found that the "'physical and mental health' factor cuts in favor of release for any defendant during this public health crisis." *See, e.g., United States v. Davis*, No. 1:20-cr-9-ELH, 2020 WL 1529158, at *4 (D. Md. Mar. 30, 2020) ("If released, Davis will be removed from a custodial setting where the risk of infection is higher for everyone, including the healthy, and he will live in the community where he is able to practice social distancing, self-quarantine, self-isolate if infected, and seek medical

26

take every necessary action to protect not only vulnerable populations, but the community at large.

### IV. Releasing Mr. Hashimi is appropriate given Mr. Hashimi's history and characteristics and his rehabilitation while incarcerated.

In determining whether Mr. Hashimi's sentence should be reduced based on an "extraordinary and compelling reason," this Court must consider whether Mr. Hashimi presents a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g). *See* U.S.S.G. § 1B1.13(2). Under the present statutory regime, the existence of extraordinary and compelling circumstances confers on this Court the authority to consider the relevant 18 U.S.C. § 3553(a) factors in determining whether a sentence reduction is appropriate.

### A. Danger to Society

In addressing a defendant's potential danger to the community, courts have found that granting release in the context of the COVID-19 pandemic better ensures public safety by decreasing the prison population. In a recent decision, the district court found that the "'physical and mental health' factor cuts in favor of release for any defendant during this public health crisis." *See, e.g., United States v. Davis*, No. 1:20-cr-9-ELH, 2020 WL 1529158, at *4 (D. Md. Mar. 30, 2020) ("If released, Davis will be removed from a custodial setting where the risk of infection is higher for everyone, including the healthy, and he will live in the community where he is able to practice social distancing, self-quarantine, self-isolate if infected, and seek medical

26

treatment if necessary.").[36]  Mr. Hashimi's release would not present a danger to the public; on the contrary, it only serves to further public safety.

Finally, Mr. Hashimi has strong support in the community.  This will be essential to his successful reintegration to society upon release.  He has maintained close ties with his family and other community members throughout his time in prison.  Backed by this support, and in light of his history, there is no reason to believe Mr. Hashimi would present a danger to society.

## B. The § 3553(a) factors and Mr. Hashimi's rehabilitation weigh in favor of relief.

There is no doubt that Mr. Hashimi's prior criminal conduct was serious.  He suffers from depression, anxiety, forgetfulness, and auditory hallucinations. The man Mr. Hashimi is today is very different from the man who stood before this Court to be sentenced.

---

[36] *See also United States v. Mclean,* No. 19-cr-380, Dkt. No. 21 (D.D.C. Mar. 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed – with one exception. That one exception – COVID-19 – however, not only rebuts the statutory presumption of dangerousness, *see* 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United States v. Michaels,* 8:16-cr-76-JVS, 2020 WL 1482553, at *1(C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i).); *United States v. Jaffee,* No. 19-cr-88, Minute Order (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement"); *United States v. Harris,* No. 19-cr-356, 2020 WL 1482342, at *1 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions.").

## C. Mr. Hashimi has a viable release plan.

Each day in custody is increasingly risky for Mr. Hashimi, who has no way to practice "social distancing" or other protective measures that are mandated by health officials throughout the nation and which promise some hope of surviving the consequences of infection. Mr. Hashimi has formulated a release plan that will adequately address the concerns presented by COVID-19, protect the public, and ensure his successful transition into the community. Mr. Hashimi will reside with his parents at 3307 Broker Lane, Woodbridge, VA 221193. MR. Hashimi's sister will provide health insurance for him through SIGMA. *See Exhibit 5.*

**V.      In the alternative, the Court should issue a non-binding recommendation that BOP transfer Mr. Hashimi to home confinement pursuant to the CARES Act.**

If the Court does not agree that the Court is authorized to grant compassionate release, Mr. Hashimi respectfully requests, in the alternative, that the Court issue a non-binding recommendation to the BOP that Mr. Hashimi be placed in home confinement for the maximum period permissible, pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (March 27, 2020), 18 U.S.C. § 3624(c)(2), the Second Chance Act of 2007, and 18 U.S.C. § 3621.

### A. BOP can and should transfer Mr. Hashimi to home confinement now.

18 U.S.C. § 3624(c)(1) provides that "The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term, under conditions that will afford

that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility." 18 U.S.C. § 3624(c)(1).

Before the enactment of the First Step Act, 18 U.S.C. § 3624(c)(2) provided: "Home Confinement Authority.—The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." 18 U.S.C. 3624(c)(2) (2008). Section 602 of the First Step Act, Pub. L. 115-391, § 404(b), 132 Stat. 5194, 5238 (2018), however, amended § 3624(c)(2) to include the following sentence: "The Bureau of Prisons shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum time permitted under this paragraph." Section 12003(b)(2) of the CARES Act, passed March 27, 2020 in reaction to the COVID-19 pandemic, provides that, during this "covered emergency period" of the COVID-19 National Emergency, "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau Prisons, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

On April 3, 2020, the Attorney General made the finding that emergency conditions are materially affecting the functioning of the BOP. This finding "expanded the cohort of inmates who can be considered for home release."[37] The

---

[37] Attorney General Memorandum for the Director of Bureau of Prisons, "Increasing Use of Home Confinement at Institutions Most Affected by COVID-10"

Attorney General directed that the BOP "immediately review all inmates who have COVID-19 risk factors, as established by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton, and similarly situated facilities where you determine that COVID-19 is materially affecting operations," or "facing similarly serious problems."[38] Now that he has exercised this authority, the Attorney General wrote, BOP's "review should include all at-risk inmates-not only those who were previously eligible for transfer."[39] In other words, the BOP may now transfer prisoners to home confinement for periods longer than the last 10 percent or 6 months of their sentence, and longer than 12 months, the previously applicable limits authorized by §3624(c)(2).

The Attorney General also authorized BOP to immediately transfer suitable inmates without first quarantining them and without electronic monitoring, if appropriate.[40] Further, he advised that although the BOP should be guided by previous memoranda on factors the BOP should consider in evaluating an inmate's suitability for home confinement, including one issued on March 26, "inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations."[41]

---

(April 3, 2020) [hereinafter 4/3/20 Barr Memo], *available at* https://www.justice.gov/file/1266661/download (last visited April 11, 2020).

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.*

**B. The Court may modify its non-binding recommendations at any time.**

While the determination about whether Mr. Hashimi is suitable for transfer to home confinement pursuant to Section 3624 is to be made solely by the BOP, this Court does have power to make a recommendation, and the BOP is required to consider a sentencing court's recommendation as to where a prisoner should serve her sentence. 18 U.S.C. § 3621(b)(4). Such a recommendation is not part of the sentence subject to appeal. *United States v. Smith*, 733 Fed. Appx. 86, 88 (4th Cir. 2018), *citing United States v. Ceballos,* 671 F.3d 852, 856 (9th Cir. 2011) (citing other circuits finding the same). Accordingly, sentencing courts may make these "nonbinding recommendations to the Bureau of Prisons at any time." *Ceballos*, 671 F.3d at 856 n.2.

**C. The Court should exercise this authority in Mr. Hashimi's case.**

The undersigned has no way of knowing whether the Warden of Mr. Hashimi's facility is considering him for home confinement. The Warden certainly should: COVID-19 is materially affecting the operations of all BOP facilities, as reflected by the fact that the BOP has placed all facilities on a 14-day lockdown. It certainly is affecting the Gilmer, which has confirmed positives according to BOP's website. Mr. Hashimi's conditions certainly put Mr. Hashimi within the priority group the Attorney General's April 3 memorandum directed the BOP to evaluate for transfer. The BOP's website states that it is "reviewing all inmates who have COVID-19 risk factors."[42]

---

[42]   BOP   website   "COVID-19   Home   Confinement   Information," https://www.bop.gov/coronavirus/ (last visited Apr. 11, 2020).

Yet, the Attorney General neither listed Gilmer among those facilities that should receive immediate attention, nor explained how BOP is to interpret "similarly affected."[43] Moreover, BOP's answers to "frequently asked questions" regarding home confinement (FAQs) as of April 8 suggested that it is was only prioritizing review to those who are at least 60 years old, and those who had served at least 50% of their sentences, consistent with Attorney General Barr's March 26 directions, but not his April 3 Memorandum. Although this document is no longer posted as the FAQ site as of April 15, it has been replaced by vague references to both the April 3 and the March 26 Memoranda from Attorney General Barr.[44] The site states that BOP has identified a list of candidates and asks outsiders *not* to submit requests for consideration for home confinement.[45]

Before speaking with the undersigned on June 30, 2020, Mr. Hashimi had never heard that the BOP was now authorized to release those with conditions like his to home confinement no matter how much longer they have to serve. Before the

---

[43] Attorney General Memorandum for the Director of Bureau of Prisons, "Increasing Use of Home Confinement at Institutions Most Affected by COVID-10" (April 3, 2020), *available at* https://www.justice.gov/file/1266661/download (last visited April 6, 2020).

[44] BOP, "Eligibility Requirements," "Frequently Asked Questions regarding potential inmate home confinement in response to the COVID-19 pandemic" website, https://www.bop.gov/coronavirus/faq.jsp (last visited Apr. 11, 2020) ("The eligibility requirements for an inmate to be considered for Home Confinement are set forth in the Attorney General's March 26 and April 3, 2020 Memoranda.").

[45] *Id.,* "Providing Assistance," ("Submitting inmate names is not necessary. BOP staff are able to run and establish lists of inmates who meet the guidance provided by the Attorney General. This process ensures that all eligible inmates who meet the criteria are reviewed and considered for movement to Home Confinement.") (last visited Apr. 11, 2020).

undersigned did, no one had approached him about whether he wishes to be transferred, or has a release plan. This provides further evidence that the BOP has not identified him for priority review, notwithstanding that his heart condition alone places him squarely within the group Attorney General Barr directed the BOP to consider.

Mr. Hashimi has a release plan, he has more years left to serve, and he is at grave risk. Transferring him to home confinement is an appropriate solution for all of the reasons given above in support of his request for compassionate release. A non-binding recommendation from the Court would help ensure that the BOP promptly considers Mr. Hashimi for transfer to home confinement, and would hopefully promote Mr. Hashimi's release without intruding on BOP's authority.

## CONCLUSION

Mr. Hashimi respectfully requests that this Court order his immediate compassionate release and impose the following supervised release conditions: 1) that MR. HASHIMI abide by the standard supervised release conditions; 2) that within 72 hours of release, MR. HASHIMI contact the U.S. Probation Office by phone for specific reporting instructions; 3) that MR. HASHIMI reside at 3307 Broker Lane, Woodbridge, VA, 22193, and be confined to the home—except when attending medical appointments or other activities approved by the U.S. Probation Office as long as this Court deems necessary. A proposed order to this effect is attached.

Respectfully submitted,

BRUCE A. JOHNSON JR., LLC

/s/

Bruce A. Johnson, Jr., Esquire (#36910)
4301 Northview Drive
Bowie, Maryland 20716
(301) 860-1505
(301) 860-1508 (facsimile)
bajjlaw@aol.com
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I certify that on this _____ day of June, 2020, I electronically filed the
foregoing with the Clerk of Court using the CM/ECF system, which will send a
notification (NEF) to the Office of the United States Attorney, 2100 Jamieson
Avenue, Alexandria, VA 22314.

/s/

Bruce A. Johnson, Jr., Esquire

34

## APPENDIX OF AUTHORITY: COURTS GRANTING COMPASSIONATE RELEASE IN LIGHT OF COVID-19

| | Authority |
|---|---|
| 1. | *United States v. Cosgrove*, Case No. 15-cr-230-RSM, 2020 WL 1875509, at *4 (W.D. Wash. Apr. 15, 2020) (granting compassionate release in light of "new evidence regarding the evolving COVID-19 health crisis"). |
| 2. | *United States v. Coker*, 3:14-CR-085, 2020 WL 1877800, at *6 (E.D. Tenn. Apr. 15, 2020) (granting compassionate release "in light of the defendant's serious medical conditions" and COVID-19). |
| 3. | *United States v. McFarlane*, No. 19-10131-NMG, 2020 WL 1866311 (D. Mass. Apr. 14, 2020) (granting compassionate release in light of COVID-19 pandemic). |
| 4. | *United States v. McPherson*, Case No. 3:94-cr-5708, 2020 WL 1862596 (W.D. Wash. Apr. 14, 2020) (granting compassionate release to defendant "at risk of COVID-19"). |
| 5. | *United States v. Ben-Yhwh*, No. 1:15-cr-830-LEK, Dkt. No. 206 (D. Hawaii Apr. 13, 2020) (Defendant's serious medical conditions "combined with the COVID-19 crisis constitute an extraordinary and compelling reason to modify his sentence."). |
| 6. | *United States v. Kataev*, 16 Cr. 763-05 (LGS), 2020 WL 1862685, at *3 (S.D.N.Y. Apr. 14, 2020) ("Defendant's unique health and family circumstances together, and in light of the COVID-19 public health crisis, constitute 'extraordinary and compelling reasons' to modify Defendant's sentence."). |
| 7. | *United States v. Smith*, No. 12 Cr. 133 (JFK), 2020 WL 1849748 (S.D.N.Y. Apr. 13, 2020) (granting compassionate release to 62-year-old with asthma and high cholesterol with 22 months remaining of 120-month sentence). |
| 8. | *United States v. Wen*, 6:17-CR-06173 EAW, 2020 WL1845104 (W.D.N.Y. Apr. 13, 2020) (granting compassionate release to 48-year-old defendant with asthma). |
| 9. | *United States v. Sawicz*, 08-cr-287 (ARR), 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020) (granting compassionate release to defendant with hypertension in light of COVID-19). |
| 10. | *United States v. Knox*, No. 15 Cr. 445 (PAE), Dkt. No. 1088 (S.D.N.Y. Apr. 10, 2020) (granting compassionate release). |
| 11. | *United States v. Tran*, CR 08-00197-DOC, 2020 WL 1820520 (C.D. Cal. Apr. 10, 2020) (granting compassionate release to defendant with asthma in light of COVID-19). |
| 12. | *United States v. Trent*, No. 16-cr-00178-CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9, 2020) ("The Court finds that in the context of the COVID-19 pandemic, these medical conditions [including diabetes and obesity], which render Trent uniquely vulnerable to serious illness if he contracts COVID-19, substantially diminish his ability to provide self-care within the environment of a correctional facility.") (citation omitted). |

| | Authority |
|---|---|
| **13.** | *United States v. Henao*, 10-cr-231 (ENV), 2020 WL 1812447, at *1 (E.D.N.Y. Apr. 9, 2020) (granting compassionate release due to defendant's "health issues, elevated risk of dire health consequences due to the current COVID-19 outbreak, and status as a non-violent offender"). |
| **14.** | *United States v. Hansen*, 07-CR-00520(KAM), 2020 WL 1703672 (E.D.N.Y. Apr. 8, 2020) (granting compassionate release even where no "inmates or personnel at [defendant's] current facility have been diagnosed with the COVID-19 virus"). |
| **15.** | *United States v. McCarthy*, No. 3:17-CR-0230, 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020) (granting compassionate release to 65-year-old defendant suffering from "COPD, asthma, and other lung-related ailments" that "substantially increase [defendant's] risk of severe illness if he contracts COVID-19"). |
| **16.** | *United States v. Hakim*, CR 05-40025 (S.D. Apr. 6, 2020) (granting compassionate release to 48-year-old defendant with chronic kidney disease and hypertension). |
| **17.** | *United States v. Zukerman*, 16 CR 194, 2020 WL 1659880, at *4 (S.D.N.Y. Apr. 3, 2020) (granting compassionate release where, "[a]lthough [defendant's] original release date may be far off, the threat of COVID-19 is at his doorstep"). |
| **18.** | *United States v. Foster*, No. 1:14-cr-324-02, Dkt. No. 191 (M.D. Pa. Apr. 3, 2020) (noting the "unprecedented" circumstances facing "our prison system" and finding that COVID-19 is an extraordinary and compelling basis for release; indeed, "[n]o rationale is more compelling or extraordinary"). |
| **19.** | *United States v. Resnick*, 14 CR 810 (CM), 2020 WL 1651508, at *7 (S.D.N.Y. Apr. 2, 2020) (granting compassionate release due to "(1) the highly infectious nature of COVID-19, (2) the limitations in a prison environment (even a prison medical center) on practicing the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and (3) [defendant's] ailments]"). |
| **20.** | *United States v. Colvin*, No. 19-cr-179, 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020) (granting compassionate release for defendant with diabetes, "which substantially increases [defendant's] risk of severe illness if she contracts COVID-19"). |
| **21.** | *United States v. Hernandez*, No. 18-cr-20474, Dkt. No. 41 (S.D. Fla. Apr. 2, 2020) (granting unopposed motion for compassionate release for defendant with cancer and immunosuppression and just under 12 months left to serve on 39 month sentence). |
| **22.** | *United States v. Brannan*, No. 4:15-CR-80-01, 2020 WL 1698392 (S.D. Tex. Apr. 2, 2020) (granting compassionate release to 66-year-old defendant with high blood pressure and high cholesterol). |

| | Authority |
|---|---|
| 23. | *United States v. Perez*, No. 17 CR. 513-3 (AT), 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020) (granting compassionate release where "[t]he benefits of keeping [Mr. Perez] in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave" in light of COVID-19). |
| 24. | *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020) (granting release after finding risk factors for COVID-19 constitute extraordinary and compelling reason and noting that prisons are "tinderboxes for infectious disease"). |
| 25. | *United States v. Williams*, No. 3:04cr95/MCR, 2020 WL 1751545 (N.D. Fla. Apr. 1, 2020) (granting compassionate release for defendant convicted of armed bank robbery and firearms offenses). |
| 26. | *United States v. Jepsen*, No. 3:19-cv-00073(VLB), 2020 WL 1640232, at *5 (D. Conn. Apr. 1, 2020) (granting compassionate release to defendant who "suffers from multiple chronic conditions that are in flux and predispose him to potentially lethal complications if he contracts COVID-19"). |
| 27. | *United States v. Gonzalez*, No. 2:18-cr-232-TOR, 2020 WL 1536155, at *3 (E.D. Wash. Mar. 31, 2020) (releasing defendant one month into a 10 month sentence in light of medical issues; in normal times defendant's conditions would be manageable but "[t]hese are not normal times"). |
| 28. | *United States v. Dana*, 14-CR-405-4 (JMF), Dkt. No. 108 (S.D.N.Y. Mar. 31, 2020) (granting compassionate release in light of COVID-19 pandemic). |
| 29. | *United States v. Marin*, No. 15-cr-252, Dkt. No. 1326 (E.D.N.Y. Mar. 30, 2020) (granting compassionate release "for the reasons stated in [defendant's] motion, including his advanced age, significantly deteriorating health, elevated risk of dire health consequences due to the current COVID-19 outbreak, status as a non-violent offender, and service of 80% of his original sentence."). |
| 30. | *United States v. Muniz*, Case No. 4:09-cr-199, 2020 WL 1540325, at *1 (S.D. Tex. Mar. 30, 2020) (releasing defendant serving 188-month sentence for drug conspiracy in light of vulnerability to COVID-19, recognizing "individuals housed within our prison systems nonetheless remain particularly vulnerable to infection"). |
| 31. | *United States v. Powell*, No. 1:94-cr-316-ESH, 2020 WL 1698194, at *1 (D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust in light of open misdemeanor case). |
| 32. | *United States v. Campagna*, 16 CR 78-01 (LGS), 2020 WL 1489829, at *2 (S.D.N.Y. Mar. 27, 2020) ("Defendant's compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify Defendant's sentence . . . ."). |