**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | Civil Case No.: 1:20-CV-1148 |
| *Respondent* | Criminal Case No.: 1:16-CR-135 |
| v. | The Hon. Liam O'Grady |
| AHMAD SAYED HASHIMI, | |
| *Defendant-Petitioner*. | |

**THE UNITED STATES' RESPONSE IN OPPOSITION**
**TO PETITIONER'S MOTION UNDER 28 U.S.C. § 2255**

The United States of America opposes Ahmad Sayed Hashimi's petition to vacate his sentence pursuant to 28 U.S.C. § 2255. Petitioner concedes that his principal claim under *McCoy v. Louisiana* has already been litigated on direct appeal. *See* Memorandum of Law in Support of Petitioner's Motion Pursuant to 28 U.S.C. § 2255, ECF No. 139, at 2-3 (hereinafter "Pet. Br."). Petitioner is therefore barred from raising that claim in a § 2255 motion. In any event, petitioner clearly cannot satisfy the evidentiary requirements established by that case.

Petitioner's next 12 claims cite various ways in which he believes his trial counsel failed to adequately investigate his case and/or failed to provide meaningful adversarial testing of the prosecution's case. These claims follow the same pattern: Citing either his own self-serving declaration or simply speculating about hypothetical evidence that may not even exist, petitioner contends that trial counsel could have developed a trove of exculpatory material. In no instance is there reason to believe trial counsel was ineffective. Nor, to the extent petitioner must show prejudice, is there any reason to doubt the outcome of the trial.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.  The Charges against Petitioner

Beginning in November 2009, petitioner ran a large-scale drug conspiracy. As part of that conspiracy, petitioner bought powder cocaine, diluted it, and used his drug trafficking organization to sell it within the Eastern District of Virginia, Maryland, and Washington, D.C. During the course of the conspiracy, petitioner began a romantic relationship with Hilina Damte, who petitioner initially used to conduct cocaine sales.

Over time, petitioner became interested in distributing a lower-risk, higher-profit drug, and eventually decided to begin distributing oxycodone. Along with Damte, petitioner created, organized, and managed a large-scale conspiracy to fraudulently obtain oxycodone from pharmacies and sell the pills into the community. Petitioner used Damte as a buffer to insulate himself from co-conspirators and law enforcement. To that end, he directed Damte to recruit "runners," obtain oxycodone, and sell oxycodone on his behalf.

Petitioner regularly beat Damte. Police responded to domestic violence calls at their apartment on multiple occasions and observed that Damte was bruised, swollen, and bleeding. On at least two occasions, Damte went to the emergency room to receive treatment. During the fall of 2013, the relationship between petitioner and Damte further deteriorated. Petitioner became suspicious that Damte was stealing pills from him, which led petitioner showing up at Damte's apartment, cornering her, and beating and choking her. The abuse ended only when Damte fled and took with her cocaine that petitioner had prepared for sale.

Petitioner began searching for Damte. On November 8, 2013, petitioner discovered that Damte was planning to meet with another individual for a drug transaction. Petitioner assembled a gang of five men and prepared to attack Damte. Petitioner and men in two other cars arrived at the drug deal, blocked Damte's car, and began to beat her. Petitioner dragged Damte from her

vehicle into a getaway car, where petitioner continued to punch Damte in her head and face. The men drove to petitioner's car. Petitioner dragged Damte to his car, before driving into Washington, D.C.

Damte was able to call 911, but petitioner took the phone from her and told the dispatcher that there was no problem. Petitioner threatened to kill Damte. Eventually, Damte was able to escape from the car during a momentary stop at a red light and find police assistance.

Damte was arrested shortly after the kidnapping in connection with the oxycodone conspiracy. She pled guilty and was incarcerated. Petitioner continued to run his drug conspiracies. As late as July 2015, petitioner sold cocaine and morphine to a confidential source, Mohamed Waly.

On April 12, 2016, petitioner was arrested. On June 22, 2016, he was indicted by a grand jury in the Eastern District of Virginia on four counts: (1) Conspiracy to Distribute Oxycodone; (2) Conspiracy to Distribute Cocaine; (3) Kidnapping; and (4) Interstate Domestic Violence. Petitioner pled not guilty. Trial was set for September 26, 2016.

**B.  The September 23, 2016 Status Conference**

The attorneys prosecuting the case extended numerous plea offers to petitioner. The government extend both pre-indictment and post-indictment plea offers. ECF No. 109, at 11. Approximately two weeks before trial, petitioner expressed interest in pleading guilty to either the cocaine distribution charge or kidnapping charge—but not both. *Id.* at 11-12. The attorneys prosecuting the case rejected that offer. *Id.* at 12. Petitioner's trial counsel then called supervisors at the U.S. Attorney's Office and convinced them to allow petitioner to plead guilty to the single kidnapping count in exchange for dismissing the remaining three counts. *Id.* The government prepared the plea papers, but petitioner demanded extensive edits to the proposed statement of facts. *Id.* The attorneys prosecuting the case spent most of Monday, September 19, 2016—one

week before trial—revising the proposed statement of facts, only for petitioner to ultimately reject the plea offer that evening. *Id.*

On Wednesday, September 21, 2016, petitioner filed a motion to continue the trial date. ECF No. 61. The following day, Thursday, September 22, 2016, the Court held a hearing to consider the motion. The Court took the motion under advisement. Following that hearing, petitioner told trial counsel that he wanted to plead guilty to kidnapping. ECF No. 109, at 13. The attorneys prosecuting the case informed petitioner that his only option, at that late juncture, was to plead guilty to all four counts of the Indictment. *Id*.

The following day, Friday, September 23, 2016, the Court held a status conference. First, trial counsel withdrew his motion for a continuance (that is, the motion filed as ECF No. 61), noting that he had received the materials he asked for in order to proceed. *Id.* at 3. Second, petitioner provided a letter to the Court in which he asked for a new attorney because petitioner believed trial counsel was not adequately consulting with him. *Id.* at 5-7. Trial counsel explained that he and petitioner "had no less than six personal meetings and too many phone calls to count," that he was "fully prepared," and that if he were not prepared, he "wouldn't hesitate" to inform the Court. *Id.* at 7.

Petitioner next explained that "when [trial counsel] came to [him] with a plea, he made [him] feel extremely uncomfortable by misinforming [him] about the terms and conditions of the plea." *Id.* at 9. Petitioner also claimed that, at one point when trial counsel "came with a plea agreement, it ended with a heated verbal confrontation with him, which he only gave [petitioner] exactly two minutes of his time before he started shouting and stormed out of the room." *Id.* at 9.

At this point, the Court interjected to explain that "this is just personality differences." *Id.* at 10. After having the parties outline the plea offers that had been extended to petitioner, the Court

4

asked petitioner whether his trial counsel had communicated all plea offers. *Id.* at 13-14. Petitioner explained that he rejected the offer to plead guilty to kidnapping only because he did not trust his trial counsel's calculation of the Guidelines Sentencing Range, not because he maintained his innocence. *Id.* at 14. In explaining his position, petitioner claimed that his trial counsel was not familiar with his criminal history. *Id.* Trial counsel responded that petitioner's claim was inaccurate, explaining that he "was fully aware of Mr. Hashimi's record," and that "there is no way [he] would be able to even sit down and go over [the] Guidelines without knowing his record." *Id.* at 15.

The Court concluded that petitioner had been informed of the plea offers and explained that it had "no question" that trial counsel has "gone above and beyond what's required" to assist petitioner. *Id.* at 14.

### C.  The Trial and Sentencing

The trial began on September 26, 2016 and ended on September 28, 2016. The United States called 15 witnesses, including Damte, who testified about petitioner's drug activities, his habitual abuse of her, and his abduction of her. The government called additional co-conspirators and eye-witnesses to petitioner's offenses, including Dina Traitouros, Jordan Taylor, Christopher Bryant, Esmeralda Chavez, Waheed Azimi, and Mohammad Malik. They corroborated Damte's testimony, as well as each other's testimony. The government also called witnesses from law enforcement, tax officials, and a forensic accountant, including FBI Special Agent Andrew B. Lenhart and FBI forensic accountant Sandra Dovalina. The defense called three witnesses: Olivia Lee, Jacqueline Alfaro, and Mohamed Abubaker.

After the defense rested and out of the presence of the jury, trial counsel informed the Court that:

> Mr. Hashimi would like to tender a plea of guilt to kidnapping and interstate violence. We would ask the Court to accept the plea to those counts. Of course, we will be asking that he be given [the] reduction for acceptance of responsibility. I recognize this is more of a gray area at this point. I do believe that he is entitled to accept responsibility as to those two counts and take that off the plate for the jury, Your Honor.

9/28/2016 Tr. 572-73 (ECF No. 112). After hearing argument from the government, the Court denied petitioner's attempt to plead guilty. *Id.* at 573-74. Petitioner did not object to trial counsel's attempt to enter a guilty plea on the kidnapping and interstate domestic violence charges.

In light of petitioner's last-minute attempt to plead guilty, during closing argument trial counsel said:

> The last few days I've done very little, if no questioning relating to the kidnap and domestic violence. Shame on Mr. Hashimi, shame on him. I am sure he was humiliated that Hilina was cheating on him behind his back, I am sure, but that doesn't excuse what he did. And if he were allowed to, he would accept responsibility for that right in front of you.

*Id.* at 620. The jury found petitioner guilty on all four counts. ECF Nos. 73, 80. This Court sentenced petitioner to 240 months on both drug conspiracy counts, 300 months as to the kidnapping count, and 120 months on the interstate domestic violence count, all to run concurrently. ECF No. 94.

### D.  Subsequent Litigation

Petitioner appealed to the Fourth Circuit, which unanimously affirmed his conviction. *See* 718 Fed. App'x 178 (4th Cir. Jan. 22, 2018). Petitioner then filed a writ of certiorari. *See* Petition for a Writ of Certiorari, No. 18-5184 (June 9, 2018). The Supreme Court vacated petitioner's conviction and remanded to the Fourth Circuit for further consideration in light of *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018). *See* 139 S. Ct. 377 (2018). The Fourth Circuit again affirmed petitioner's conviction. *See* 768 Fed. App'x 159, 162-63 (4th Cir. Apr. 25, 2019). Petitioner filed

a motion for rehearing *en banc*, which the Fourth Circuit denied. ECF No. 124. Petitioner timely filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255. ECF Nos. 138, 139.

## ARGUMENT

### I.     The Defendant is Not Entitled to Relief under *McCoy v. Louisiana*.

Petitioner's principal argument is that he is entitled to a new trial under *McCoy v. Louisiana*, which held that criminal defendants have a Sixth Amendment right "to decide on the objective of [their] defense," and that an attorney may not make the strategic decision to concede guilt over a defendant's "intransigent and unambiguous objection." 138 S. Ct. 1500, 1501, 1507 (2018). Doing so is structural error that entitles a defendant to a new trial without the requirement of showing prejudice. *Id.* at 1511.

Petitioner concedes that he has already litigated on direct appeal the question whether he is entitled to a new trial under *McCoy*. Pet Br. 2-3; *see* 768 Fed. App'x 159 (4th Cir. Apr. 25, 2019). Petitioner is therefore barred from re-raising this claim in his § 2255 motion because it is "well settled" that a petitioner "cannot circumvent a proper ruling … on direct appeal by re-raising the same challenge in a § 2255 motion." *United States v. Dyess*, 730 F.3d 354, 360 (4th Cir. 2013) (citation and internal quotation marks omitted) (ellipse in original); *see United States v. Linder*, 552 F.3d 391, 396 (4th Cir. 2009). While the Fourth Circuit explained that petitioner could re-raise the claim in a § 2255 motion "if there are facts not currently in the record before [the Fourth Circuit]," (768 Fed. App'x at 163) the only new "evidence" raised by petitioner is a self-serving declaration raising "conclusory allegations" that are "insufficient to raise cognizable claims of ineffective assistance of counsel." *United States v. Hawkins*, 531 Fed. App'x 342, 345 (4th Cir. June 28, 2013) (citing *United States v. Demik*, 489 F.3d 644, 646 (5th Cir. 2007) (internal quotation marks omitted). Simply reaffirming the contents of his previous arguments before the Fourth

Circuit in a newly-sworn declaration does not satisfy the Fourth Circuit's requirement of producing new evidence.[1]

In any event, this case is a far cry from *McCoy*. In *McCoy*, the Supreme Court found a Sixth Amendment violation based on its conclusion that trial counsel conceded the defendant's guilt in closing argument "over the defendant's intransigent and unambiguous objection." *McCoy*, 138 S. Ct. at 1507. Specifically, the defendant in *McCoy* not only testified at trial that he was innocent but protested to the trial judge (apparently out of earshot of the jury) that his attorney was "selling [him] out" during closing argument. *Id.* at 1506-07 (alteration in original).

Here, by contrast, petitioner relies on an implicit "understanding" that he wanted to maintain his innocence with respect to the kidnapping charge. Pet. Br. 15. Not only is that insufficient under *McCoy*—which, again, requires contemporaneous evidence of "the defendant's intransigent and unambiguous objection," *McCoy*, 138 S. Ct. at 1507—but the record does not reflect an understanding that petitioner wanted to maintain his innocence. To the contrary, petitioner attempted to plead guilty to kidnapping and interstate domestic violence *during the trial*. 9/28/2016 Tr. 572-74 (ECF No. 112). Petitioner also expressed interest in pleading guilty to kidnapping *twice* in the days leading up to trial. ECF No. 109, at 11-13. Moreover, petitioner rejected the offer to plead guilty to kidnapping not because he maintained his innocence but because he did not trust his trial counsel's calculation of his Guidelines range. *Id.* at 14.

Evaluating this evidence, the Fourth Circuit had no trouble concluding that "the record in this case includes no definitive evidence regarding whether Hashimi consented or objected to his counsel's concession of guilt on Counts 3 and 4 prior to closing argument" and therefore rejected

---

[1] Petitioner's remaining evidence with respect to *McCoy* rests on trial transcripts that were part of the record on appeal. *See* Pet. Br. 14-16 (referring to statements made at the September 23, 2016 status conference and during trial).

his claim under *McCoy*. 768 Fed. App'x at 159. The Fourth Circuit's decision was a proper application of *McCoy* because of the lack of "the defendant's intransigent and unambiguous objection." *McCoy*, 138 S. Ct. at 1507. Petitioner's self-serving declaration—the only new "evidence" presented here—is simply not enough to satisfy *McCoy* on its own terms.

## II.    None of the Remaining Claims for Relief are Meritorious.

Petitioner raises 12 additional claims alleging that trial counsel failed to adequately investigate his case and failed to provide meaningful adversarial testing of the prosecution's case.

Petitioner's claims relating to trial counsel's investigation of the case should be evaluated by the familiar and rigorous two-pronged test established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Under the first prong, which addresses a counsel's professional competence, petitioner must demonstrate that, in light of all the circumstances as they appeared at the time of the conduct, "counsel's representation fell below an objective standard of reasonableness"—that is, below "prevailing professional norms." *Strickland*, 466 U.S. at 687-88. Among other things, petitioner may demonstrate his attorney's efforts fell below an objective standard of reasonableness by showing that the attorney failed to "undertake reasonable steps to investigate all avenues of defense." *Wood v. Zahradnick*, 578 F.2d 980, 982 (4th Cir. 1982).

There is a "strong presumption" that trial counsel's conduct was within the wide range of reasonable professional assistance. *Strickland*, 668 U.S. at 689-90. The Supreme Court has cautioned that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way," (*id.* at 689) and noted in particular that the reasonableness of a counsel's actions often depend on "informed strategic choices made by the defendant and on information supplied by the defendant." *Id.* at 691. With respect to claims that trial counsel failed to adequately investigate a case, the Supreme Court has said that "a particular decision not to investigate must

9

be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*

To satisfy the second prong of the *Strickland* test, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *See id.* at 694. Put another way, a petitioner must affirmatively prove prejudice that is so serious as to have deprived him of a fair trial, defined to mean a trial whose result is unreliable. *See id.* at 687, 694.

The Fourth Circuit has labeled the two prongs of the *Strickland* test as the "performance prong" and the "prejudice prong." *See Fields v. Attorney Gen. of Md.*, 956 F.2d 1290, 1297 (4th Cir. 1992). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700. Because "[t]he defendant bears the burden of proving *Strickland* prejudice," if a defendant fails to meet this burden, "a reviewing court need not consider the performance prong." *Fields*, 956 F.2d at 1297; *see Strickland*, 466 U.S. at 697.

By contrast, petitioner is not required to show prejudice for his claims that trial counsel failed to provide meaningful adversarial testing. In *United States v. Cronic*—decided the same day as *Strickland*—the Supreme Court identified certain "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. 648, 658 (1984). One such example is when there has been "a constructive denial of counsel." *United States v. Ragin*, 820 F.3d 609, 618 (4th Cir. 2016) (citing *Cronic*, 466 U.S. at 659). Thus, a petitioner who can show that trial counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing" is entitled to a new trial without having to show prejudice because,

in such a case, "the adversary process itself [is] presumptively unreliable." *Cronic*, 466 U.S. at 659.

### A.    Petitioner Cannot Demonstrate Ineffective Assistance of Counsel

While the following 12 claims vary in their details, they all fail for the same reason: Under both *Strickland* and *Cronic*, petitioner bears the burden of showing trial counsel's performance was constitutionally deficient. *Strickland*, 466 U.S. at 689-90; *Cronic*, 466 U.S. at 658. In order to meet that burden and overcome the strong presumption that trial counsel's performance was effective, petitioner must do more than raise conclusory, vague, or speculative claims about his case. *See Hawkins*, 531 Fed. App'x at 345. Petitioner fails that test. Additionally, to the extent petitioner must demonstrate prejudice in order to satisfy *Strickland*, he provides no reasons to "undermine confidence" in the outcome of the trial. *See Strickland*, 466 U.S. at 694.

*Ground Two:* Petitioner contends that trial counsel "failed to investigate and present to the jury available electronic evidence" that would have rebutted Damte's testimony about the kidnapping. Pet. Br. 19; 9/26/2016 Tr. 186-95 (ECF No. 110). But petitioner does not identify any supposedly helpful electronic evidence. Instead, he has submitted a self-serving declaration that claims this unidentified evidence would have supported his account that Damte "willingly went with [him] to the District of Columbia, freely left [his] car, returned to [his] car a few seconds later to retrieve pills that she had left in [his] car, and again freely walked away." Declaration of Ahmad Sayed Hashimi in Support of Motion to Vacate and Set Aside Sentence Pursuant to 28 U.S.C. § 2255, ECF No. 140 ¶ 6 (hereinafter "Pet. Dec."). That is not enough to satisfy petitioner's burden under *Strickland.*

Petitioner also contends that trial counsel did not subject the prosecution's case to meaningful adversarial testing because trial counsel did not cross-examine any witnesses about who owned the car used during Damte's abduction, and points out that "[n]o evidence was

presented at trial that the vehicle belonged to Mr. Hashimi or to Mr. Baker."[2] Pet. Br. 20. Petitioner's own declaration, however, refers to the vehicle as "my car" and at the least admits that he was with Damte in the car. Pet. Dec. ¶ 6.

Petitioner further complains that trial counsel failed to raise the fact that Mr. Abubaker had been arrested and then released following the kidnapping and failed to raise that petitioner had not been arrested for the kidnapping until two years after the incident. Pet. Br. 20. Neither fact is relevant to petitioner's guilt.

Petitioner additionally contends that, during trial counsel's cross-examination of Damte, trail counsel mistakenly confirmed that petitioner beat and kidnapped her. Pet. Br. 20. But Ms. Damte had *already testified on direct examination that petitioner beat her repeatedly and kidnapped her*. 9/26/2016 Tr. 169-81 (ECF No. 110) (abuse); *id.* at 186-95 (kidnapping). Trial counsel's strategy on cross-examination was to impeach Damte, partly by showing that she had previously lied to the police. In order to achieve that goal, trial counsel cited incidents in which the police came to petitioner and Damte's home in response to suspected domestic abuse and Damte lied to police by telling them nothing had happened. 9/27/2016 Tr. 223-24 (ECF No. 111). Trial counsel also accused Damte of initially telling police that Mr. Abubaker—not petitioner— had beaten her and kidnapped her. *Id.* at 224-26. Far from admitting his client's guilt, any fair reading of the trial transcript shows that trial counsel was attempting to show the jury that they could not trust Damte's testimony.

Petitioner also contends that trial counsel should have cross-examined two other witnesses—Dina Traitouros and Jordan Taylor—about their inability to identify petitioner or about the car used in the kidnapping. Pet. Br. 20. But petitioner concedes that these facts were already

---

[2] "Baker" refers to Abubaker Abubaker. Mr. Abubaker's brother, Mohamed Abubaker, also known as "Little Mo," was called as a trial witness by the defense.

part of the record. *See* Pet. Br. 20 (citing trial transcript). And, again, petitioner himself admits that he was in the car with Damte. Pet. Dec. ¶ 6.

Nothing in the previous four paragraphs demonstrates a Sixth Amendment violation. The evidence trial counsel allegedly failed to adduce was either already in the record or immaterial. With respect to trial counsel's cross-examination of Damte, the record shows trial counsel executing a standard tactic in a competent manner. The jury almost certainly found Damte credible, but that illustrates the strength of the government's case, not ineffective assistance of counsel.

***Ground Three:*** Petitioner next contends that "[t]rial counsel failed to investigate and challenge the validity of the government's search warrant executed at Mr. Hashimi's residence." Pet Br. 21. Specifically, the search warrant affidavit states that, on July 29, 2015, a confidential informant purchased a white powdery substance from Hashimi that field-tested positive for cocaine. Exhibit B, ECF No. 139-2, ¶¶ 75-80. Subsequent lab tests, however, confirmed that the substance was not, in fact, a controlled substance. 9/27/2016 Tr. 465-66 (ECF No. 111). Petitioner claims that trial counsel failed to investigate this evidence and failed to provide meaningful adversarial testing by not filing a motion to suppress or cross-examining the agent who signed the warrant about the fact the substance was ultimately not a controlled substance. Pet. Br. 21-22.

The decision not to file a motion to suppress was a reasonable strategic choice that did not prejudice the petitioner. The search warrant affidavit is 39 pages and contains numerous pieces of evidence that supplied probable cause to search petitioner's home—even excluding the July 29, 2015 controlled purchase. Among other things, the affidavit identified "approximately 40 additional co-conspirators" in the conspiracy to distribute oxycodone, including petitioner. ECF No. Ex. B, 139-2, ¶ 8. The affidavit noted that "[n]ine of these co-conspirators ha[d] been convicted of federal drug-conspiracy charges," and that based on information provided by the co-

conspirators, investigators identified petitioner as one of the leaders of the conspiracy. *Id.* ¶¶ 15-16. One co-conspirator (identified as CC-1 in the affidavit) identified petitioner as having been involved in drug crimes and running a prostitution ring since 2011. *Id.* ¶ 21. That individual also tied petitioner to specific cocaine sales and implicated petitioner in the oxycodone conspiracy. *Id.* ¶¶ 22-23, 25. Another co-conspirator (identified as UCC-26) corroborated this information. *Id.* ¶¶ 34-35. The affidavit also quoted from jail calls between petitioner and the co-conspirator in which they discuss their criminal activity (*id.* ¶¶ 41-43), as well as calls between petitioner and an unidentified male subject discussing drug business. *Id.* ¶ 44; *see also id.* ¶¶ 72-73 (more calls discussing drug business).

Petitioner's claim that there was a "false statement" in the search warrant affidavit is wholly without merit. The affidavit reports that the white powder "field tested positive for cocaine." *Id.* ¶ 80. There is zero evidence that statement about the results of the field test was *inaccurate*, let alone *false* as commonly understood in this context.

With respect to trial testimony, once again the evidence identified by petitioner—here, the fact that the white substance tested negative—was already in evidence because Special Agent Lenhart testified to that fact on direct examination. 9/27/2016 Tr. 465-66 (ECF No. 111). Rather than focus on an undisputed piece of evidence, trial counsel made the reasonable decision to focus on other parts of Lenhart's testimony on cross-examination.[3]

---

[3] Petitioner contends that "[i]t cannot be overstated that much of the prosecution's cocaine distribution conspiracy case, including the initial complaint against Mr. Hashimi and the arrest warrant for Mr. Hashimi relied upon this false statement in Special Agent Lenhart's affidavit." Pet. Br. 22. The extensive amount of information provided in the search warrant affidavit disproves this claim. In any event, at this stage of proceedings, the validity of the Complaint or subsequent Indictment is not at issue. The United States has proved its case beyond a reasonable doubt to a jury.

14

***Ground Four:*** Petitioner next contends that trial counsel "failed to investigate the source of the $8,100 found in a sock in Mr. Hashimi's residence," which the United States argued constituted proceeds of drug sales. Pet. Br. 22. Petitioner contends that if "trial counsel investigated" "he would have been able to show that it arose from a legitimate source." Pet. Br. 22.

Petitioner has offered no inkling as to the supposedly legitimate source of those funds. Instead, once again, he relies exclusively on his own declaration, which states that the money "came from a legitimate source and was not the proceeds of illegal drug activity." Pet. Dec. ¶ 7. Once again, that is simply not enough to show a Sixth Amendment violation.

***Ground Five:*** Petitioner next contends that trial counsel failed to subject the government's case to meaningful adversarial testing by not interviewing or subpoenaing "the individual identified at trial by Ms. Damte as 'Sharon' in order to rebut Ms. Damte's testimony." Pet. Br. 22. To provide context, Sharon was identified at trial as the person who obtained false prescriptions on behalf of petitioner. 9/26/2016 Tr. 120-21 (ECF No. 110); *id.* at 151-55.

Petitioner claims that he does not know Sharon. Pet. Dec. ¶ 8; Pet Br. 23. Similarly, defendant contends that trial counsel should have interviewed and subpoenaed other co-conspirators—Kentucky, Biggs, Primo, Homza, and Carver. Pet. Br. 23. He claims those individuals "are friends of [petitioner]" and "none of them or me were at any time involved together in any conspiracy to distribute drugs." Pet. Dec. ¶ 9. In both cases, petitioner's claims are based entirely on his own self-serving declaration, which again is not enough to meet his burden under *Strickland*. Moreover, testimony from any of these individuals would not have meant petitioner wasn't involved in drug trafficking; it would have proved, at most, that those individuals were not aware of petitioner's criminal conduct.

15

**Ground Six:** Petitioner next contends that trial counsel failed to investigate and subject the prosecution's case to meaningful adversarial testing by "fail[ing] to interview and subpoena the FBI informant identified by FBI Agent Laura Walker at Mr. Hashimi's preliminary hearing on April 15, 2016." Pet. Br. 23. That FBI informant had previously told the FBI that Damte, not petitioner, was in charge of the conspiracy to distribute oxycodone and that petitioner did not know about the scheme until sometime in 2013. Pet. Br. 23; *see* Preliminary and Detention Hearing, ECF No. 107, at 17-20.

As an initial matter, this claim should be evaluated under *Strickland*, not *Cronic*, meaning that petitioner is required to demonstrate both deficient performance and prejudice. That is because petitioner's complaint is not based on trial counsel's alleged failure to contest an aspect of the government's case but rather on trial counsel's decision not to present evidence on petitioner's behalf. Petitioner can demonstrate neither prong of *Strickland*: He identifies no reasonable probability that the testimony of a single informant at a specific point in time would override the overwhelming evidence of his guilt, and certainly does not provide reason to undermine confidence in the outcome of the trial.

**Ground Seven:** Petitioner next contends that trial counsel should have interviewed and subpoenaed inmates at the Alexandria Detention Center who introduced petitioner to Waheed Azimi, who testified at trial that he'd previously bought drugs from petitioner. Pet. Br. 24; 9/27/2016 Tr. 390-94 (ECF No. 111). According to petitioner's declaration, testimony from these inmates would have rebutted Azimi's testimony. Pet. Dec. ¶ 10; Pet. Br. 24. Petitioner does not name or attempt to identify the inmates who would have offered such testimony. It is likely such inmates do not exist but, at the very least, it was reasonable for trial counsel to not devote valuable time attempting to track-down this hypothetical evidence.

**Ground Eight:** Petitioner next contends that trial counsel failed to interview and subpoena Mohamed Waly, an informant who participated in a controlled purchase involving petitioner.[4] Petitioner contends that it was important for trial counsel to establish that Waly had a history of drug abuse because the controlled purchases were "the only sale/purchase of any drug transactions that the FBI could show that directly involved Mr. Hashimi." Pet. Br. 24.

Not calling Mr. Waly was a reasonable strategic decision given that the government played a recording of the July 23, 2015 purchase of drugs by Mr. Waly from petitioner. 9/27/2016 Tr. 449-54 (ECF No. 111). Mr. Waly's testimony would only have further corroborated what happened at the controlled purchase. Moreover, the government's case was mainly based on testimony by co-conspirators and other witnesses, so there is no reason to believe that Waly's testimony—even if favorable—would have changed the outcome of the trial.

**Ground Nine:** Petitioner next contends that trial counsel violated the Sixth Amendment by failing to present copies of petitioner's federal tax returns to the jury. Pet. Br. 25. Petitioner's theory is that the returns would have proved he filed tax returns in 2011, 2012, and 2014, thus rebutting prosecution testimony that he didn't declare income, which is common behavior for drug-dealers. Pet. Br. 25. There is no dispute that petitioner filed tax returns for at least some of those years because the United States presented evidence that petitioner received a tax refund from the federal government at some point. 9/27/2016 Tr. 428 (ECF No. 111). The dispute is whether petitioner reported any *income* during those years. And even petitioner does not claim he reported any income. *See* Pet. Dec. ¶ 12. Regardless, any dispute over whether petitioner reported income is ancillary to determining his guilt; even if petitioner's taxes showed he reported income that

---

[4] Waly participated in two controlled purchases, one on July 23, 2015 and one on July 29, 2015. As explained above, the July 29, 2015 controlled purchase did not involve a controlled substance.

17

alone would not be enough to undermine confidence in the result of the trial because reporting income does not mean petitioner was not engaged in a drug conspiracy.

***Ground 10:*** Relatedly, petitioner next contends that trial counsel should have cross-examined the FBI's forensic accountant, Sandra Dovalina, concerning her testimony that petitioner received tax refunds for certain years. Pet. Br. 25. As above, merely demonstrating that petitioner filed a federal tax return and received a refund does not prove he reported any income, let alone that he was not part of a drug conspiracy.

***Ground 11:*** Petitioner next contends that trial counsel failed to subject the government's case to meaningful adversarial testing by purportedly "fail[ing] to prepare defense witness Mohamed Abubaker." Pet. Br. 25. Petitioner claims that, by not properly preparing Mr. Abubaker, trial counsel prejudiced petitioner because Mr. Abubaker's testimony implicated Peace Ishmael, also known as "Auk," as petitioner's "enforcer in terms of collecting a debt" owed to petitioner. Pet. Br. 26.

Similar to Ground Six, this claim should be evaluated under *Strickland*, not *Cronic*, because petitioner's argument is based on trial counsel's decision to present evidence on petitioner's behalf. While it's true that trial counsel spent little time talking to Mr. Abubaker prior to calling him as a witness, trial counsel had discovery materials related to Abubaker's testimony—a fact reinforced by trial counsel's explanation that he wanted Abubaker to testify because Abubaker had "retracted" his previous statements implicating petitioner. 9/26/2016 Tr. 9 (ECF No. 110); *see also* 9/27/2016 Tr. 365-69 (ECF No. 111) (trial counsel providing additional reasons he wanted to call Abubaker).

On substance, petitioner focuses on trial counsel's questions on direct examination relating to Auk's collection of a debt on behalf of petitioner. Although trial counsel's direct examination

of Mr. Abubaker did not progress the defense in any significant manner—most of the questioning on direct examination focused on Damte's role in the conspiracy without implicating or exonerating petitioner—neither did it significantly damage petitioner.

To be sure, Mr. Abubaker's testimony on cross-examination was damaging to petitioner. He testified that, while he "technically" owed Damte money she fronted him to purchase cocaine, petitioner subsequently called Abubaker to demand repayment—testimony that further implicated petitioner in the conspiracy and undermined petitioner's defense that he was not involved. 9/28/2016 Tr. 555-57 (ECF No. 112). Petitioner does not assert that trial counsel should have refrained from calling Mr. Abubaker under any circumstance. In any event, the decision to call Mr. Abubaker is the type of strategic decision generally left to the discretion of trial counsel and his testimony provides no reason to undermine confidence in the outcome given the additional evidence against petitioner.

*Ground 12:* Petitioner next contends that trial counsel violated his Sixth Amendment rights by "fail[ing] to consult in any substantive way with the defendant on the preparation of his defense." Pet. Br. 26. Specifically, petitioner contends that trial counsel did not "consult with Mr. Hashimi about the details of his case or discuss with him a theory of his defense." *Id.* (citing Pet. Dec. ¶ 13). Petitioner claims that, if trial counsel had done so, he "would have been able to interview and subpoena witnesses" but trial counsel's failure to "thoroughly prepare for trial resulted in the numerous claims identified" previously. *Id.* at 27.

To the extent this argument raises issues not covered by the previous ten claims, the record shows that while petitioner may have had a difficult relationship with his trial attorney, trial counsel provided professional and competent representation. Undisputed record evidence shows that trial counsel "had no less than six personal meetings and too many phone calls to count" with

19

petitioner. ECF No. 109, at 7. Based on this record, the Court previously determined that petitioner's trial attorney had "gone above and beyond what's required to try and assist [petitioner.]" *Id.* at 14.

**Ground 13:** Finally, petitioner argues that the "cumulative effects" of the previously discussed 11 claims of ineffective assistance violated his Sixth Amendment rights. Pet Br. 27. Because none of the previous 11 claims have merit, neither does petitioner's argument about their supposed cumulative effect.

### B.  Broader Review of Trial Counsel's Performance Shows it was Effective.

*Strickland* requires that analysis of counsel's performance typically must be comprehensive; *i.e.* not narrowly limited to a review of counsel's failings. *See Strickland*, 466 U.S. at 688 ("In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."). Here, that type of mandated comprehensive review shows that trial counsel was effective.

Trial counsel was dealt a difficult hand. It is clear that he had a challenging relationship with petitioner. But, as this Court explained, trial counsel went "above and beyond." ECF No. 109, at 14. Most notably, trial counsel successfully convinced supervisors in the U.S. Attorney's Office to allow petitioner to plead guilty to a single count of the Indictment when the attorneys prosecuting the case were insisting he plead guilty to two counts. Having secured that agreement, petitioner ultimately decided to reject that offer. By the time petitioner changed his mind on the eve of trial, it was too late.

At trial, counsel was confronted with overwhelming evidence of petitioner's guilt. The United States' primary witness, Damte, not only provided first-hand knowledge of the conspiracy, but also testified that she did not want a sentence reduction in exchange for her truthful testimony because she would rather remain in prison than be removed to Ethiopia—making it extremely

difficult to impeach her testimony. 9/26/2016 Tr. 94 (ECF No. 110) (testifying that she did not want a sentence reduction); 9/27/2016 Tr. 231 (ECF No. 111) ("I would rather remain in jail than possibly get killed in Ethiopia."). In addition, multiple other witnesses corroborated Damte's testimony and provided additional details about petitioner's conduct. Trial counsel performed competenly under these difficult circumstances. Certainly, none of trial counsel's work fell below prevailing professional norms and his performance provides no reason to doubt the outcome of the trial.

## **CONCLUSION**

Petitioner had a fair trial and received effective representation. The United States respectfully asks the Court to deny petitioner's § 2255 motion.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney


_____/s/_____
Philip Alito
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Office:   (703) 299-3700
Fax:       (703) 299-3980
Email:   Philip.Alito@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 23, 2020, I filed electronically the foregoing with the

Clerk of Court using the CM/ECF system.

By: _____/s/_____

Philip Alito
Assistant United States Attorney